LELAND E. STARR AND OTHERS, *d.b.a.* THE ORIGINAL
LEE'S McKNIGHT BUILDING COFFEE SHOP, v.
COOKS, WAITERS, WAITRESSES AND
HELPERS UNION LOCAL NO. 458
AND OTHERS.[1]

May 20, 1955.

No. 36,449.

[1]Reported in 70 N. W. (2d) 873.

*Donald F. Pratt* and *Guesmer, Carson, MacGregor, Clifford & Pratt,* for appellants.

*Solly Robins* and *Robins, Davis & Lyons,* for respondents.

MATSON, JUSTICE.

Plaintiffs—in injunction proceedings to restrain the defendant labor union from having more than one picket at each of plaintiffs' business entrances and from demanding that plaintiffs enter into a collective bargaining contract before the union has become the bargaining agent of plaintiffs' future employees under the Minnesota labor relations act—appeal from an order vacating the temporary restraining order and denying plaintiffs' motion for a temporary injunction.

Preparatory to the opening of a new restaurant to be known as The Original Lee's McKnight Building Coffee Shop, the plaintiffs, at all times pertinent herein, were engaged in remodeling space which they had rented for that purpose in the McKnight Building in downtown Minneapolis. All questions involved arise out of alleged union demands, abortive negotiations, and picketing which occurred during the remodeling of the premises and before the opening of the new restaurant and likewise before plaintiffs had hired any employees to operate the same. The dispute, which incidently does not involve interstate commerce, is limited to the McKnight Building premises and to the remodeling or preoperation period of the proposed restaurant.

Plaintiffs are copartners who, long prior to the establishment of the new restaurant, have operated two restaurants in St. Paul known as Lee's Highland Village Inn and Lee's Kitchen. In Minneapolis third parties operate, in the same general area as the McKnight Building, a restaurant known as Lee's Broiler which ten years earlier had been bought from Frank E. Lee, one of the plaintiffs herein.

Defendants, hereinafter referred to collectively as the union unless otherwise indicated, consist of the union and certain of its officers and agents. The union has a membership of persons holding jobs similar to those which will be held by persons to be hired in the future by the plaintiffs to operate the new restaurant.

Basic to the identification and resolution of the legal issues herein is a determination of the controlling facts. There has been no attempt to settle the dispute by any bona fide effort at collective bargaining since, in all conferences and communications, the parties have been sparring for position and have been unwilling to exchange views even to the extent necessary to discover the actual issues upon which they cannot agree. Plaintiff Lee testified that on April 26, 1954, John F. Curtis, organization director for the union, telephoned him and requested a conference *to go over a union contract*. Upon cross-examination Lee said that Curtis had asked if the plaintiffs intended *to work under union conditions*. Plaintiff Leland E. Starr testified that Curtis had asked him to sign a union contract for the McKnight Building Coffee Shop. Starr said he refused on the ground that it was premature to discuss a contract since plaintiffs then had no employees and further because they would not force their future employees to join a union. He also said that Curtis then indicated the union would banner the premises with the consequences that the "trades" would stop working. Subsequently plaintiffs Starr and Elmer E. Wobig, plaintiffs' attorney, an attorney for the associated industries, defendant Curtis, and his attorney met in conference. Starr testified that at this conference Curtis and the attorney with him said they were not asking for anything and that all they wanted was to advertise the facts. Upon cross-examination Starr said Curtis had endeavored to get him or Lee to discuss the wage scale and working conditions to be established in the coffee shop in order to determine whether there would be a union establishment. Shortly thereafter pickets appeared with banners and handbills.

Curtis testified that the banners displayed by the pickets reading "STRIKE[2] *A Blow for better eating places. Eat only at union cafes*"

[2]The court is not passing upon the propriety of conspicuously displaying the word *strike* when no strike is in progress.

were for the information of the public and that the words "union cafes" meant cafes which complied with the standard conditions as to holidays, vacation pay, seniority, working conditions, hours, work week, wages, and death benefits. He further said that union cafes were not union shops but were recognized as cafes that are fair competition and are trying to establish working conditions satisfactory to union members. Curtis said the handbill advertising plaintiffs' Highland Village Inn in St. Paul as unfair was prepared to inform the public that plaintiffs' proposed coffee shop in the McKnight Building was not to be confused with Lee's Broiler in Minneapolis which operated a union house, paid union wages, and met all union standards. The pickets would be withdrawn, Curtis said, if the union were assured that plaintiffs would live up to certain specified union standards. He reiterated that plaintiffs need not operate a union house but it was only necessary that they agree to comply with certain union standards which were flexible and subject to negotiation.

At the close of the testimony, plaintiffs' attorney informed the court that his clients would be willing to discuss the entire matter with Mr. Curtis as soon as the latter could show that he represented a majority of the employees.

Upon this conflicting evidence the trial court made these findings of fact: That the defendants had not demanded a union contract which would cover prospective employees and had not sought to coerce plaintiffs to sign a contract binding them to hire only union members or to require them to encourage their future employees to join the union in violation of M. S. A. 179.12(3) ; that the union had not claimed to represent any present or future employees of the plaintiffs; that it had not sought a closed-shop contract or any contract at all but had simply attempted to induce plaintiffs to agree to certain wage, benefit, and working condition standards similar to those in effect in other restaurants and which were flexible and subject to negotiation; and that defendants had used banners to advertise the fact that plaintiffs, according to their understanding, were not operating under a union in their St. Paul cafes and had refused

to agree to adopt union standards for the operation of the proposed Minneapolis coffee shop.

The court further found that the picketing had been limited to one picket or banner carrier at each of the three entrances to the building and that the picketing had been peaceful with the exception of one isolated instance. The court found that the plaintiff Starr had been told, when he appeared with one of the deliverymen, that there would be no sanctions or punishment to a man who made a delivery, even though he was a member of another union.

The findings of the trial court are sustained by the evidence. Since the controlling facts are established by such findings, we must accept them as true in determining whether the trial court erred in refusing to issue a temporary injunction.

■ The decisions of the United States Supreme Court are controlling since the questions herein arise primarily under the constitution of the United States. Coons v. Journeymen Barbers, etc. Union, 222 Minn. 100, 23 N. W. (2d) 345; Glover v. Minneapolis Bldg. Trades Council, 215 Minn. 533, 10 N. W. (2d) 481, 147 A. L. R. 1071. The Glover decision, which recognized peaceful picketing (to induce an employer to hire union labor to do work which he had been doing personally) as an exercise of freedom of speech secured by U. S. Const. Amend. XIV, was based on principles enunciated by the United States Supreme Court in the Senn,[3] Thornhill,[4] Carlson,[5] Meadowmoor,[6] Swing,[7] Wohl,[8] and Ritter[9] cases. In the Coons

[3]Senn v. Tile Layers Protective Union, 301 U. S. 468, 57 S. Ct. 857, 81 L. ed. 1229.

[4]Thornhill v. Alabama, 310 U. S. 88, 60 S. Ct. 736, 84 L. ed. 1093.

[5]Carlson v. California, 310 U. S. 106, 60 S. Ct. 746, 84 L. ed. 1104.

[6]Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc. 312 U. S. 287, 61 S. Ct. 552, 85 L. ed. 836, 132 A. L. R. 1200.

[7]A. F. of L. v. Swing, 312 U. S. 321, 61 S. Ct. 568, 85 L. ed. 855.

[8]Bakery & Pastry Drivers, etc. v. Wohl, 315 U. S. 769, 62 S. Ct. 816, 86 L. ed. 1178.

[9]Carpenters & Joiners Union v. Ritter's Cafe, 315 U. S. 722, 62 S. Ct. 807, 86 L. ed. 1143.

case[10] consideration was given to the import of the later decision of Cafeteria Employees Union v. Angelos, 320 U. S. 293, 64 S. Ct. 126, 88 L. ed. 58. Since the Coons decision the United States Supreme Court has handed down several significant opinions which have qualified the prior holdings of that court with respect to the exercise of the right of peaceful picketing as a phase of freedom of speech under the Fourteenth Amendment. Among these decisions are Giboney v. Empire Storage & Ice Co.,[11] Hughes v. Superior Court,[12] International Brotherhood, etc. v. Hanke,[13] Building Service Union v. Gazzam,[14] and Plumbers Union v. Graham.[15]

In determining under what circumstances picketing may be enjoined, in the light of the United States Supreme Court decisions handed down from 1940 to the present time, three elements must be taken into consideration; namely, (1) the manner or character of the picketing, (2) the objective sought, and (3) the persons who are affected. Before 1940, picketing as a means of exerting economic pressure was considered to be an actionable tort unless justified.[16] Thereafter, the decision of Thornhill v. Alabama, *supra,* established the doctrine that peaceful picketing is a constitutionally protected medium of free speech which under the Fourteenth Amendment is immune from hostile state action. In subsequent cases[17] immunity of picketing as a form of free speech was qualified when the court recognized that picketing, conducted in a context of violence, loses its communicative character as an appeal to reason and becomes instead a weapon of force. Although the court reaffirmed peaceful

---

[10]The court held in the Coons case that peaceful picketing of the business premises of one who did his own work and had no employees, even though the picketing caused a loss of patronage and prevented deliveries, was a part of freedom of speech secured by U. S. Const. Amend. XIV and could not be enjoined.

[11]336 U. S. 490, 69 S. Ct. 684, 93 L. ed. 834.

[12]339 U. S. 460, 70 S. Ct. 718, 94 L. ed. 985.

[13]339 U. S. 470, 70 S. Ct. 773, 94 L. ed. 995.

[14]339 U. S. 532, 70 S. Ct. 784, 94 L. ed. 1045.

[15]345 U. S. 192, 73 S. Ct. 585, 97 L. ed. 946.

[16]Tanenhaus, *Picketing—Free Speech,* 38 Cornell L. Q. 1.

[17]Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc. *supra.*

picketing as a means of communication, it held that picketing would be enjoined where it is attended with acts of violence and its continuance excites reasonable fears that violence will be resumed. Thus, the court upheld the right of a state to enjoin picketing when it is enmeshed with violence or conducted in a manner which is productive of violence.[18] Minnesota expressly recognized peaceful picketing as a constitutionally protected form of free speech by enacting a statute which prohibits its courts from restraining picketing *as a means of publicizing the facts in a labor dispute as long as it involved neither fraud nor violence.* M. S. A. 185.10(5).

The second qualifying element, *the objective sought,* was added to the juristic appraisal of picketing by the Giboney, Hughes, Hanke, and Gazzam decisions. This involved a recognition that picketing has a hybrid character[19] and that, in addition to being a medium for the dissemination of information concerning the facts of a labor dispute, it is a specie of economic coercion. In Giboney v. Empire Storage & Ice Co. *supra,* the union resorted to picketing for the avowed and immediate objective of compelling Empire to stop selling ice to nonunion peddlers. If Empire had agreed to the union's demand, it would have violated a Missouri statute which imposed a fine of up to $5,000 and a prison sentence up to five years for entering into an agreement in restraint of trade. Furthermore, by agreeing, Empire would have been subject to actions for triple damages by any ice peddlers injured by the agreement. In upholding the right of Missouri to enjoin the picketing of Empire, the United States Supreme Court held that the guarantees of freedom of speech and press stemming from the First and Fourteenth Amendments to the federal constitution do not immunize speech or writing when used as an integral part of a course of action whose sole and immediate

[18]Hotel & Restaurant Employees', etc. v. Wisconsin Employ. Rel. Board, 315 U. S. 437, 62 S. Ct. 706, 86 L. ed. 946; Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc. *supra.*

[19]International Brotherhood, etc. v. Hanke, 339 U. S. 470, 70 S. Ct. 773, 94 L. ed. 995; Hughes v. Superior Court, 339 U. S. 460, 70 S. Ct. 718, 94 L. ed. 985; see, 24 So. Calif. L. Rev. 145; Jaffe, *In Defense of the Supreme Court's Picketing Doctrine,* 41 Mich. L. Rev. 1037.

objective is to cause a violation of a state's basic statutory policy. The court, however, emphasized that states cannot consistently with the constitution abridge the constitutional freedoms in order to obviate slight inconveniences or annoyances to the public, or abridge them to enjoin conduct which falls short of presenting a clear danger of violating a valid statute declaratory of the state's public policy.[20] See, 38 Cornell L. Q. 1, 33 to 35.

■ In general, the recent decisions of the United States Supreme Court hold that a state may constitutionally enjoin peaceful picketing which is undertaken or conducted for an unlawful objective.[21] Constitutionally an objective may be declared contrary to public policy or unlawful by either the state's legislature or its judiciary.[22] Although the public policy of a state may be found in its constitution, statutes, and court decisions, its establishment is primarily for the lawmakers.[23] The burden of proving an unlawful objective continues to rest, however, on the person seeking the injunction.[24] Subject to certain limitations which have not been defined with either clarity or finality, the determination of what is an unlawful objective has been left to the states by the recent United States

---

[20]In the Hanke case, the Washington state court, after declaring that *the union's interest* in the welfare of a mere handful of members (of whose working conditions no complaint at all is made) *is far outweighed by the interests of the individual proprietors and the people of the community as a whole*, restrained the peaceful picketing of a business conducted by the owners themselves (without employees) to compel compliance with a demand for a union shop. In the Gazzam case, the court upheld the state's right to restrain the picketing of an employer to compel him to coerce his employees' choice of a bargaining agent as an attempt to induce a transgression of the state's policy against such coercion of employees.

[21]*E.g.*, Giboney v. Empire Storage & Ice Co. 336 U. S. 490, 69 S. Ct. 684, 93 L. ed. 834; Building Service Union v. Gazzam, 339 U. S. 532, 70 S. Ct. 784, 94 L. ed. 1045.

[22]International Brotherhood, etc. v. Hanke, *supra;* Hughes v. Superior Court, *supra.*

[23]Building Service Union v. Gazzam, *supra.*

[24]Tanenhaus, *Picketing—Free Speech*, 38 Cornell L. Q. 1, 49; Galler v. Slurzberg, 27 N. J. Super. 139, 99 A. (2d) 164.

Supreme Court decisions.[25] The element of *what persons are affected* has a bearing upon what constitutes a sound public policy. In the Hanke case the majority opinion assumed that a state, in determining the permissibility of restrictions on picketing in a particular case, may weigh such community interests as free communications, effective unions, and the welfare of small businessmen;[26] the dissents and the special concurrence, however, leave the future of the "community interests" test in doubt.

■ We need not here, however, attempt to formulate a general rule for defining the allowable area of economic conflict. Since picketing is a hybrid it would be erroneous to adopt a rule which protects from injunctive restraint all picketing which has at least one lawful objective.[27] Realistically, almost any instance of picketing has for one of its objectives the communication of information. Equally unsatisfactory is a rule which would enjoin picketing which has any objective which is unlawful.[28] The determination of what is the immediate or controlling objective in a given instance of picketing is primarily a question of fact.[29]

[25]The following articles are helpful in understanding and applying the recent United States Supreme Court decisions: Tanenhaus, *Picketing—Free Speech*, 38 Cornell L. Q. 1; Tanenhaus, *Picketing as a Tort*, 14 U. of Pittsburgh L. Rev. 170; Petro, *Picketing and Labor Strategy*, 2 Labor L. J. 243; Petro, *Effects and Purposes of Picketing*, 2 Labor L. J. 323; Crenshaw, *Injunctions Against Secondary Picketing and Picketing for an Unlawful Purpose*, 12 Ala. Law. 155; Jaffe, *In Defense of the Supreme Court's Picketing Doctrine*, 41 Mich. L. Rev. 1037; Cox, *The Influence of Mr. Justice Murphy on Labor Law*, 48 Mich. L. Rev. 767, 787 to 793; 26 Notre Dame Law. 745; 49 Col. L. Rev. 711; Howard, *The Unlawful Purpose Doctrine in Peaceful Picketing, etc.*, 24 So. Calif. L. Rev. 145.

[26]See, 38 Cornell L. Q. 1, 40.

[27]See Peters v. Central Labor Council, 179 Ore. 1, 169 P. (2d) 870, for an instance where such a rule was rejected.

[28]See, Cafeteria Employees Union v. Angelos, 320 U. S. 293, 64 S. Ct. 126, 88 L. ed. 58; but see Fred Wolferman, Inc. v. Root, 356 Mo. 976, 982, 204 S. W. (2d) 733, 736, 174 A. L. R. 585, for such a rule; Restatement, Torts, § 796.

[29]It is not to be overlooked that an avowed objective of picketing may, of course, prove to be merely a sham for an objective which is unlawful. See,

In the light of the foregoing principles the injunction here was properly denied since the picketing was peaceful and involved no unlawful objective. We have no violation of § 179.11 which provides that it shall be an unfair labor practice (5) to have more than one picket at a single entrance[30] or (7) for any employee, labor organization, or officer, agent, or member thereof, to compel or attempt to compel any person against his will to join or to refrain from joining any labor organization. Furthermore, it has been factually determined by the trial court that the picketing by the union was not for the unlawful purpose of persuading or inducing the plaintiffs to violate § 179.12(3), which declares it to be an unfair labor practice for an employer to encourage or discourage membership in any labor organization. It is true that the picketing occurred before the plaintiffs had either opened the coffee shop or hired any employees, but this fact is of no significance since § 179.01, subd. 7, specifically provides that:

" 'Labor dispute' includes any controversy concerning * * * conditions * * * of employment * * * regardless of whether or not the relationship of employer and employee exists as to the disputants."[31]

Our statutes contain no provision which declares that it shall be an unlawful act for a labor organization, its members, or officers or agents to negotiate with a prospective employer for the maintenance of employment conditions or standards, or which, if a dispute arises

---

Bickford's, Inc. v. Mesevich, 107 N. Y. S. (2d) 369. It is recognized that a state court, in determining the permissibility of restricting picketing, should include in the balance the effectiveness of alternative means for securing the objective (Benetar and Isaacs, *Pickets or Ballots?* 40 A. B. A. J. 848) and the practicality of separating the unlawful from the lawful objective. In a proper case it may be feasible to sever the lawful from the unlawful and enjoin only the unlawful picketing. Society of New York Hospital v. Hanson, 185 Misc. 937, 59 N. Y. S. (2d) 91, affirmed without opinion, 272 App. Div. 998, 73 N. Y. S. (2d) 835.

[30]See American Steel Foundries v. Tri-City Council, 257 U. S. 184, 42 S. Ct. 72, 66 L. ed. 189, for effect of presence of large number of pickets.

[31]See, A. F. of L. v. Swing, 312 U. S. 321, 61 S. Ct. 568, 85 L. ed. 855; Lauf v. E. G. Shinner & Co. 303 U. S. 323, 58 S. Ct. 578, 82 L. ed. 872.

with respect thereto, prohibits peaceful picketing. Significantly, the United States Supreme Court in A. F. of L. v. Swing, 312 U. S. 321, 326, 61 S. Ct. 568, 570, 85 L. ed. 855, 857, said:

"* * * A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him. The interdependence of economic interest of all engaged in the same industry has become a commonplace."

The order of the trial court is affirmed.
Affirmed.