DANIEL EMERY AND ANOTHER, d.b.a. THE MAIN DINER, v. HOTEL AND RESTAURANT EMPLOYEES UNION LOCAL NO. 556 AND OTHERS.*

161 N. W. (2d) 842.

September 13, 1968—No. 40,440.

* Certified to U. S. Supreme Court February 3, 1969.

*Raymond J. Kempe,* for appellants.

*Solly Robins, Stanford Robins,* and *Robins, Davis & Lyons,* for respondents.

NELSON, JUSTICE.

Plaintiffs appeal from a judgment of the District Court of Ramsey County and an order of that court granting defendants' motion for a judgment notwithstanding the special verdicts of the jury and, should that order be reversed, granting defendants a new trial unless plaintiffs consented to a reduction of the total amount of the verdict from $13,500 to $8,500. Defendants seek review of that part of the court's order which conditionally granted a new trial and denied their motion for a new trial in so far as it was based on asserted errors of law and insufficiency of the evidence.

If all conflicts in the evidence are resolved in favor of the prevailing parties below, the facts appear to be as follows: Plaintiffs, Daniel and Mileda Emery, brought this action on December 31, 1963, seeking damages from the defendant union and Ernest Legato, Kenneth Everhart, Julius Karlakofski, and Harold Kensinger, as individuals, for activities designed to force one of the plaintiffs to join the union.

In March 1961 plaintiffs purchased The Main Diner, a restaurant with a seating capacity of 23 or 24 persons. At that time plaintiffs had a part-time employee, Irma Yanish. They advanced the money for her to join defendant union, defendant Ernest Legato having contacted them about her becoming a member. Mrs. Emery at the time of the purchase was a waitress at the Manor and belonged to the union, helping her husband out at The Main Diner in her off hours. Later in 1961 she quit her job and worked fulltime at the diner. Irma Yanish left the employ of plaintiffs in December 1962.

Acting upon defendant Legato's advice, Mrs. Emery took a withdrawal card from the union after leaving the Manor because she would, with her husband, be acting as manager or employer of The Main Diner. Legato agreed that she would no longer receive benefits by belonging to the union. She paid the usual fee for the withdrawal card. Later in February 1963, Legato contacted Mrs. Emery at The Main Diner about her or her husband joining the union. They refused. Mr. Emery stated that he and his wife were owners and operators of the restaurant and under the circumstances would not join the union. Thereafter, Emery received notice that he should appear before the state labor conciliator and did so twice. At the first meeting defendant Kensinger told Emery he would be put out of business unless he joined the union but he still refused.

Sometime toward the end of June 1963, Legato contacted plaintiffs at The Main Diner to join the union. Mr. Emery stated that he did not know which one was the employer or the employee, they were just owners, and they did not want to join. During June, Legato recommended and the union hired a picket, Legato instructing him what to do. The picket, on hand during the busiest time of the day, carried a sign or banner and would stand in front of the door or walk slowly back and forth before the restaurant. Mr. Emery was told that the picket would be removed if either he or his wife joined the union. After the picketing began, plaintiffs' business was reduced by over one-half.

Mr. Emery testified that on October 24, 1963, he saw defendants Legato, Everhart, and others stopping 20 or 25 customers in front of the restaurant, tapping them on the shoulder, and talking to them, and that the customers turned away and did not come into the diner. At that time Legato and Everhart passed out leaflets saying that The Main Diner was "unfair." When Emery called the police, the union organizers disappeared.

Mr. Emery testified that the picketing continued into 1964 and that since his business had fallen off he went to several realtors to try to sell but was unsuccessful for several months. Emery testified that he had purchased the restaurant for $4,500 in 1961 and had gradually increased its business so that prior to the union picketing it was worth $10,000. The increased value resulted from much hard work: Plaintiffs put in over

12 hours a day working in their restaurant, replaced quite a bit of the restaurant equipment, and Mrs. Emery cooked hot meals "like you would have at home." The best offer plaintiffs could obtain for the business was $5,000, to be paid by a downpayment of only $300 and payments of $75 per month until the balance was paid off. The restaurant was sold on those terms on July 1, 1964, but the purchaser made only one monthly payment of $75 and then left town, making no further payments.

At the conciliation meetings Emery made it clear that plaintiffs had no employees and that he and his wife were management and would not obtain any benefits by joining the union. He testified that one of the union representatives at the meetings said that unless he or his wife joined the union he would be ruined and "thrown to the financial wolves."

The testimony indicated that the dispute between the union and plaintiffs came about because the restaurant did not display a union house card, something that either plaintiff could obtain by joining the union.

Article XV of the collective bargaining agreement, admitted in evidence as defendants' exhibit 1 which had been signed by Mr. Emery and a representative of defendant union on October 16, 1961, reads in part:

"In those establishments where an owner or owners work a shift or shifts, *such owner or owners must become passive members of the Union under the rules and regulations of the International Union* and the provisions of the International Union's Constitution and the Local Union's by-laws, and any amendments thereto, in order to display the Union House Card, and such owner or owners, need become passive members only under the following circumstances:

"1. *In establishments where all work is done by one (1) or two (2) working proprietors or partners, such proprietor or proprietors shall become passive members of the Union.* In such establishments, all relief or extra help, as hereinafter defined, must be members of the Union if they work in excess of eight (8) hours a week." (Italics supplied.)

Defendant Everhart admitted that he had written a letter to Mr. White, business agent of the American Linen Company employees (who worked nearby and patronized plaintiffs' restaurant), asking him to advise their union members not to patronize The Main Diner; and that

bulletins were mailed to other unions in the area stating they were not to patronize the diner. Defendant Everhart admitted also that even if plaintiffs were to join the union as passive members they would not be able to vote at any union meetings nor would they be able to attend any union meeting to voice their views; and that the only thing a passive member does is to pay dues.

It is the contention of plaintiffs that the evidence is conclusive that the activities of defendants and the purposes or objectives of the union in picketing their place of business were unlawful. The determination of what is the immediate or controlling objective in a given instance of picketing is primarily a question of fact. The jury found that defendants had violated Minn. St. 179.11(7) and 179.42, and that plaintiffs had suffered damages of $3,000 resulting from overall picketing; of $250 from the letter sent by defendant Everhart to the American Linen Company union representative; and of $250 from activities of certain of the defendants on October 24, 1963. The jury assessed punitive damages of $10,000. The court in its post-trial order granted a new trial (if its order granting judgment notwithstanding the verdict were reversed) unless plaintiffs consented to a reduction of the verdict from $13,500 to $8,500.

■ We will first give consideration to § 179.11(7), which reads as follows:

"It shall be an unfair labor practice:

\*    \*    \*    \*    \*

"(7) For any employee, labor organization, or officer, agent, or member thereof, to compel or attempt to compel any person to join or to refrain from joining any labor organization or any strike against his will by any threatened or actual unlawful interference with his person, immediate family, or physical property, or to assault or unlawfully threaten any such person while in pursuit of lawful employment."

It would appear that the natural interpretation of this statute, as was indicated by this court in Starr v. Cooks, etc. Union Local No. 458, 244 Minn. 558, 70 N. W. (2d) 873, comprehends that a labor practice which attempts to compel a person to join or refrain from joining a labor

organization against his will shall be unlawful and therefore not a protected exercise of freedom of expression.

It is clear of course that the phrase "threatened or actual unlawful interference" refers only to strikes. The legislature was undoubtedly aware that there are various means of coercion and did not intend to allow some coercive methods to the exclusion of other coercive methods to compel one to join or refrain from joining a labor union.

■ Defendants cite Coons v. Journeymen Barbers, etc. Union, 222 Minn. 100, 23 N. W. (2d) 345, as a controlling case in support of their position. It is clear that this court decided the Coons case solely upon the then existing United States Supreme Court decisions.

In the Starr case, an action to restrain a union and others from picketing, the court below found that the picketing had been limited to one picket or banner carrier at each of the three entrances to plaintiffs' building and that the picketing had been peaceful with the exception of one isolated instance. The trial court also found that one of the plaintiffs had been told, when he appeared with a deliveryman, that there would be no sanctions or punishment to a deliveryman who made a delivery even though he was a member of another union. This court held that the findings of the trial court were sustained by the evidence and stated that since the controlling facts were established by such findings we were required to accept them as true in determining whether the trial court erred in refusing to issue a temporary injunction. Citing Coons v. Journeymen Barbers, etc. Union, *supra*, and Glover v. Minneapolis Bldg. Trades Council, 215 Minn. 533, 10 N. W. (2d) 481, 147 A. L. R. 1071, the court went on to say that the decisions of the United States Supreme Court were controlling, since the questions therein arose primarily under the Constitution of the United States.

The court in the Starr case noted that the Glover decision, which recognized peaceful picketing (to induce an employer to hire union labor to do work which he had been doing personally) as an exercise of freedom of speech secured by U. S. Const. Amend. XIV, was based on principles enunciated by the United States Supreme Court in Senn v. Tile Layers Protective Union, 301 U. S. 468, 57 S. Ct. 857, 81 L. ed. 1229; Thornhill v. Alabama, 310 U. S. 88, 60 S. Ct. 736, 84 L. ed. 1093; Carlson v. Cali-

fornia, 310 U. S. 106, 60 S. Ct. 746, 84 L. ed. 1104; Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc. 312 U. S. 287, 61 S. Ct. 552, 85 L. ed. 836, 132 A. L. R. 1200; A. F. L. v. Swing, 312 U. S. 321, 61 S. Ct. 568, 85 L. ed. 855; Bakery & Pastry Drivers, etc. v. Wohl, 315 U. S. 769, 62 S. Ct. 816, 86 L. ed. 1178; and Carpenters & Joiners Union v. Ritter's Cafe, 315 U. S. 722, 62 S. Ct. 807, 86 L. ed. 1143.

In Coons, an action by the owner-operator of a barbershop to restrain a union from picketing his shop to induce him to join the union, the later decision of Cafeteria Employees Union v. Angelos, 320 U. S. 293, 64 S. Ct. 126, 88 L. ed. 58, was held to be controlling. We therefore held in the Coons case that peaceful picketing of the business premises of one who did his own work and had no employees, even though the picketing caused a loss of patronage and prevented deliveries of supplies, was a part of the freedom of speech secured by U. S. Const. Amend. XIV and could not be enjoined.

Since the Coons decision the United States Supreme Court has handed down several significant opinions which have qualified the prior holdings of that court with respect to the exercise of the right of peaceful picketing as a phase of freedom of speech under the Fourteenth Amendment. Among these decisions are Giboney v. Empire Storage & Ice Co. 336 U. S. 490, 69 S. Ct. 684, 93 L. ed. 834; Hughes v. Superior Court, 339 U. S. 460, 70 S. Ct. 718, 94 L. ed. 985; International Brotherhood, etc. v. Hanke, 339 U. S. 470, 70 S. Ct. 773, 94 L. ed. 995; Building Service Union v. Gazzam, 339 U. S. 532, 70 S. Ct. 784, 94 L. ed. 1045; and Plumbers Union v. Graham, 345 U. S. 192, 73 S. Ct. 585, 97 L. ed. 946.

As we pointed out in the Starr case, in determining under what circumstances picketing may be enjoined in the light of the United States Supreme Court decisions handed down from 1940 to the present time, three elements must be taken into consideration, namely, (1) the manner or character of the picketing; (2) the objective sought; and (3) the persons who are affected. Prior to 1940 picketing as a means of exerting economic pressure was considered to be an actionable tort unless justified. Thereafter, the decision of Thornhill v. Alabama, *supra*, established the doctrine that peaceful picketing is a constitutionally protected medium of free speech which, under the Fourteenth Amendment, is immune from

hostile state action. In Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc. *supra,* immunity of picketing as a form of free speech was qualified when the court recognized that picketing conducted in a context of violence loses its communicative character as an appeal to reason and becomes instead a weapon of force. Although the Supreme Court re-affirmed peaceful picketing as a means of communication, it held that picketing would be enjoined where it is attended with acts of violence and its continuance excites reasonable fears that violence will be resumed. Thus, the court upheld the right of a state to enjoin picketing when it is enmeshed with violence or conducted in a manner which is productive of violence. Minnesota expressly recognized peaceful picketing as a con-stitutionally protected form of free speech by enacting a statute which prohibits its courts from restraining picketing as a means of publicizing the facts in a labor dispute as long as it involved neither fraud nor violence. Minn. St. 185.10(5).

■ In the Starr case we stated that the second qualifying element, the objective sought, was added to the juristic appraisal of picketing by the Giboney, Hughes, Hanke, and Gazzam decisions; and that this involved a recognition that picketing has a hybrid character and is, in addition to being a medium for the dissemination of information concerning the facts of a labor dispute, a specie of economic coercion.

This court, speaking through Mr. Justice Matson, went on to say (244 Minn. 565, 70 N. W. [2d] 878):

"In general, the recent decisions of the United States Supreme Court hold that a state may constitutionally enjoin peaceful picketing which is undertaken or conducted for an unlawful objective. Constitutionally an objective may be declared contrary to public policy or unlawful by either the state's legislature or its judiciary. Although the public policy of a state may be found in its constitution, statutes, and court decisions, its establishment is primarily for the lawmakers. The burden of proving an unlawful objective continues to rest, however, on the person seeking the injunction. Subject to certain limitations which have not been defined with either clarity or finality, the determination of what is an unlawful objective has been left to the states by the recent United States Supreme Court

decisions. The element of *what persons are affected* has a bearing upon what constitutes a sound public policy. In the Hanke case the majority opinion assumed that a state, in determining the permissibility of restrictions on picketing in a particular case, may weigh such community interests as free communications, effective unions, and the welfare of small businessmen; the dissents and the special concurrence, however, leave the future of the 'community interests' test in doubt.

"We need not here, however, attempt to formulate a general rule for defining the allowable area of economic conflict. Since picketing is a hybrid it would be erroneous to adopt a rule which protects from injunctive restraint all picketing which has at least one lawful objective. Realistically, almost any instance of picketing has for one of its objectives the communication of information. Equally unsatisfactory is a rule which would enjoin picketing which has any objective which is unlawful. *The determination of what is the immediate or controlling objective in a given instance of picketing is primarily a question of fact.*" (Italics supplied in part.)

See *The Unlawful Purpose Doctrine in Peaceful Picketing and Its Application in the California Cases,* 24 So. Calif. L. Rev. 145, where Professor Pendleton Howard states:

"The most striking recent development in the field of labor law has been the United States Supreme Court's retreat from the much discussed decision in 1940 in *Thornhill v. Alabama,* generally interpreted as announcing the doctrine that peaceful picketing is a form of constitutionally protected free speech immune from hostile state regulation. This retreat has been accomplished in four decisions—*Giboney v. Empire Storage & Ice Co.,* decided on April 4, 1949, and *Hughes v. Superior Court, International Brotherhood of Teamsters v. Hanke,* and *Building Service Employees International Union v. Gazzam,* all decided on May 8, 1950. Not only have these decisions cut down the reach of the *Thornhill* case, but they have thrust into sharp focus the so-called 'unlawful purpose doctrine'— the doctrine (which has won increasing favor in recent years from state courts) that, though the *manner* in which the picketing is conducted is unobjectionable, the *objective* sought by the pickets is not a legitimate one and hence their activity may be enjoined."

At this point it seems clear that the Coons case is distinguished from the situation in the case at bar by the fact that there is nothing in the Coons case to show that Coons by joining the barbers' union would be prohibited from attending union meetings, voicing his opinions on issues, and voting thereon. In the instant case, according to the testimony of witnesses for defendants, if either plaintiff were to join the union he could only be a passive member and as such could not attend any union meetings, voice his views, or vote. As passive members, all plaintiffs could do would be to pay dues.

The Supreme Court made it clear in the Giboney case by a unanimous decision that it is constitutionally possible for the states to restrict picketing, even though the manner in which it is carried on is unobjectionable, if the objective sought is an unlawful one. In the Gazzam case, Mr. Justice Minton, speaking for the court, said (339 U. S. 539, 70 S. Ct. 788, 94 L. ed. 1051):

"* * * An adequate basis for the instant decree is the unlawful objective of the picketing, namely, coercion by the employer of the employees' selection of a bargaining representative. Peaceful picketing for any lawful purpose is not prohibited by the decree under review.

"* * * Respondent does not contend that picketing per se has been enjoined but only that picketing which has as its purpose violation of the policy of the State. There is no contention that picketing directed at employees for organization purposes would be violative of that policy. The decree does not have that effect."

In the Hughes case, Mr. Justice Frankfurter stated (339 U. S. 465, 70 S. Ct. 721, 94 L. ed. 992):

"* * * Picketing is not beyond the control of a State if the manner in which picketing is conducted or the purpose which it seeks to effectuate gives ground for its disallowance. * * * 'A state is not required to tolerate in all places and all circumstances even peaceful picketing by an individual.' "

Mr. Justice Frankfurter emphatically rejected the contention frequently raised in free speech cases that judicial declarations of public policy are

not entitled to as much respect as legislative enactment (339 U. S. 466, 70 S. Ct. 722, 94 L. ed. 993):

"* * * The fact that California's policy is expressed by the judicial organ of the State rather than by the legislature we have repeatedly ruled to be immaterial.

"* * * In charging its courts with evolving law instead of formulating policy by statute, California has availed itself of the variety of law-making sources, and has recognized that in our day as in Coke's 'the law hath provided several weapons of remedy.'"

In the Hanke case, a case most important since no legislation was involved, Mr. Justice Frankfurter, speaking for the court, stated (339 U. S. 477, 70 S. Ct. 777, 94 L. ed. 1003):

"[The] Washington [Supreme Court] here concluded that, even though the relief afforded the Hankes and Cline entailed restriction upon communication that the unions sought to convey through picketing, it was more important to safeguard the value which the State placed upon self-employers, leaving all other channels of communication open to the union. * * * 'From this fact,' so we are informed * * *, 'the conclusion seems irresistible that the union's interest in the welfare of a mere handful of members (of whose working conditions no complaint at all is made) is far outweighed by the interests of individual proprietors and the people of the community as a whole, to the end that little businessmen and property owners shall be free from dictation as to business policy by an outside group having but a relatively small and indirect interest in such policy.' 33 Wash. 2d at 659, 207 P. 2d at 213.

* * * * *

"* * * But when one considers that issues not unlike those that are here have been similarly viewed by other States and by the Congress of the United States, we cannot conclude that Washington, in holding the picketing in these cases to be for an unlawful object, has struck a balance so inconsistent with rooted traditions of a free people that it must be found an unconstitutional choice. * * *

"We need not repeat the considerations to which we adverted in *Hughes v. Superior Court* that make it immaterial, in respect to the

constitutional issue before us, that the policy of Washington was expressed by its Supreme Court rather than by its legislature."

Endorsing the rationale of the Washington court was tantamount to giving courts the authority to enjoin undesirable picketing. All that was necessary was to find that the picketing contravened the community's best interests. Accordingly, the United States Supreme Court has abandoned to the states the task of defining the allowable area of economic conflict.

■ In Saveall v. Demers, 322 Mass. 70, 76 N. E. (2d) 12, 2 A. L. R. (2d) 1190, a union, composed partly of members who owned and operated their own barbershops without employees and partly of employees of master barbers, picketed a nonunion barber who owned and operated his own shop in order to compel him to join the union or raise his price. The Massachusetts court held that the picketing could not be justified as an exercise of the constitutional right of free speech, stating (322 Mass. 74, 76 N. E. [2d] 14):

"If picketing is speech it is certainly also much more. However peacefully it may be carried on, it possesses elements of compulsion upon the person picketed which bear little relation to the communication to anyone of information or of ideas. And resort is commonly had to it precisely because of these elements, which, much more than any force of argument contained in it, give it the power it possesses. To fail to recognize these facts is to put reality aside. It would seem, therefore, that even if picketing is constitutionally protected in its aspect as speech, it must, because of its other aspects, be subject to some degree of regulation as to circumstance, manner, and even object, lest orderly existence be submerged in a flood of picketing by groups of people, having no peculiar right of their own, to make other people do what they do not wish to do and as free men are under no obligation to do. If we are correct in supposing that the right to picket is subject, for the protection of paramount public welfare, to some balancing of the conflicting interests of the parties immediately involved, we have before us a case where, on the one hand, the contribution of the defendants' acts to the free interchange of thought in Fitchburg reaches the vanishing point, while on the other hand there is danger

that the fundamental right of the plaintiff to work with his own hands to what he regards as his best advantage may be destroyed."

The jury in the case at bar also found defendants had violated § 179.42, which reads as follows:

"It is an unlawful act and an unfair labor practice for any person or organization to combine with another, to cause loss or injury to an employer, to refuse to handle or work on particular goods or equipment or perform services for an employer, or to withhold patronage, or to induce, or to attempt to induce, another to withhold patronage or other business intercourse, for the purpose of inducing or coercing such employer to persuade or otherwise encourage or discourage his employees to join or to refrain from joining any labor union or organization or for the purpose of coercing such employer's employees to join or refrain from joining any labor union or organization."

The foregoing statutory provision is part of the chapter dealing with the secondary boycott. The trial court in a memorandum made a part of its post-trial order stated:

"* * * A reading of that statute will disclose that certain acts are forbidden with intent to coerce or induce an *employer,* to encourage or discourage an *employe,* to join or refrain from joining a labor organization, *or* to coerce the *employes themselves* to join or refrain from joining a labor organization. * * * It is somewhat difficult to determine why it is unlawful to coerce an employer to induce his employes to refrain from joining or to join a union, or to directly coerce an employe to refrain from joining or to join a union, while at the same time the same type of conduct, if used to coerce the employer to refrain from joining or to join a union, is not unlawful."

It is hardly conceivable that the Minnesota legislature would enact a law to prohibit or prevent coercion of employees by a union and leave no corresponding protection to prohibit or prevent coercion by a union against an employer or self-employer for an unlawful purpose. There is ample evidence in the record herein to show that these defendants unlawfully interfered with the self-employed plaintiffs' property rights.

In Riviello v. Journeymen Barbers, etc. Union, 88 Cal. App. (2d) 499, 505, 199 P. (2d) 400, 404, the California court said:

"On the authority of the Angelos case [Cafeteria Employees Union v. Angelos, 320 U. S. 293, 64 S. Ct. 126, 88 L. ed. 58] the Supreme Court of Minnesota, in a case somewhat similar to the instant one, affirmed a denial of an injunction in Coons v. Journeymen Barbers, etc. Union, 222 Minn. 100 [23 N. W. 2d 345]. There the same union here involved sought to compel the plaintiff, an operator of a one-man barber shop to join the union, and, when he refused, began to picket. Plaintiff sought to enjoin the picketing. The trial court refused to enjoin, and this action was affirmed by the Minnesota Supreme Court. The court discussed at length the holding of the Angelos case, and concluded that such case stands for the principle that it was a lawful labor objective to attempt to compel an employer-worker to become a member of the union.

"From these authorities, and the reasoning upon which they are based, it must be held that it does not violate the public policy of this state to attempt by picketing, or other lawful means, to compel an employer, who also works at the trade, to join the union of those whom he employs and with whom he works."

The California court then proceeded to consider the facts in the Riviello case to determine whether compelling one to become a passive member of a union constituted a lawful labor objective (88 Cal. App. [2d] 506, 199 P. [2d] 405):

"The fact that it is lawful to picket to attempt to compel an employer who works at the trade to join the labor organization with which he is competing, does not, however, settle the present controversy. Here the record shows that the only type of membership offered to plaintiffs is a nonactive membership. The defendants propose to picket to try to compel plaintiffs to become entirely sterile members of the union, without the right of any voice in union affairs. If they join they will have neither the right of seat nor voice in local meetings, and will not have the right to hold any union office or the right to attend conventions as union delegates. Apparently, the only 'right' they would possess would be the 'right' to pay dues. If they should join the union under such circumstances they

would thus become amenable to the rules and sanctions of the union without the right to participate in the proceedings by which such rules and sanctions are passed. A clearer case of attempting to create a discriminated against class of members cannot be imagined. This is the focal point in this case. While, as already pointed out, in this state it is lawful to attempt to 'coerce peacefully' an employer who works at the trade to induce him to join the union, it seems too clear to require lengthy discussion that such activity cannot be held to be lawful unless full membership in the union is offered. According to the uncontradicted evidence, these plaintiffs cannot remain in business unless they have a union card. * * * In other words, plaintiffs cannot earn a living at their trade unless they join the union, and, if they join, they become sterile members. That cannot and should not be held to be a proper and lawful labor objective.

"That such actions are unlawful is clearly demonstrated by the reasoning of our Supreme Court in the recent, well-reasoned and unanimous decision in James v. Marinship Corp., 25 Cal. 2d 721 [155 P. 2d 329, 160 A. L. R. 900]. There the court held that a union had no lawful right to maintain both a closed shop agreement with employers and an arbitrarily closed or partially closed union membership. * * *

*"Thus, it must be held that the objective sought by defendants is unlawful, and that the threat to picket to obtain such objective, is unlawful."* (Italics supplied.)

Thus, it is clear from the decision in Riviello that California adopted the view of the Minnesota court on the lawfulness of picketing to compel an owner-operator to join a union, but went on to say that it was unlawful to place the owner in a position of having to accept second-class membership in the union and that picketing for that purpose is not protected under the Constitution.

It appears to us that the facts in the case at bar closely parallel those in the Riviello case and that the actions of defendants must be held to constitute an unlawful labor objective. Their objective being unlawful, picketing to obtain it is also unlawful.

■ In Dinoffria v. International Teamsters Union, 331 Ill. App. 129, 72 N. E. (2d) 635, the court held that while employees may combine

for the purpose of obtaining lawful benefits for themselves, and where the primary purpose of combination is to further the interests of the organization and improve conditions of its members, whatever injury may follow is merely incidental, the law gives no sanction to combinations which have for their immediate purpose the injury of another. It was also held in Dinoffria (331 Ill. App. 142, 72 N. E. [2d] 641):

"* * * [I]t is an actionable wrong to directly or indirectly interfere with or disturb another in his business without lawful cause or justification * * *."[1]

Based upon the record herein the jury was justified in finding the objective of defendants unlawful, and in assessing damages, both general and punitive. It is thus ordered that the judgment in favor of plaintiffs be reinstated, the total verdict, however, to be reduced from $13,500 to $8,500, this in effect reducing the punitive damages from $10,000

---

[1] There can be little doubt that the United States Supreme Court has in the past 25 years retreated from its prior position that labor picketing was a form of constitutionally protected free speech which cannot be regulated by state action. This is clearly demonstrated by Giboney v. Empire Storage & Ice Co. 336 U. S. 490, 69 S. Ct. 684, 93 L. ed. 834; Hughes v. Superior Court, 339 U. S. 460, 70 S. Ct. 718, 94 L. ed. 985; International Brotherhood, etc. v. Hanke, 339 U. S. 470, 70 S. Ct. 773, 94 L. ed. 995; and Building Service Union v. Gazzam, 339 U. S. 532, 70 S. Ct. 784, 94 L. ed. 1045. The change from the former position in Thornhill v. Alabama, 310 U. S. 88, 60 S. Ct. 736, 84 L. ed. 1093, has been gradual, but its extent is clearly shown by the dissent of Mr. Justice Douglas in Teamsters Union v. Vogt, Inc. 354 U. S. 284, 297, 77 S. Ct. 1166, 1172, 1 L. ed. (2d) 1347, 1355: "Today, the court signs the formal surrender. State courts and state legislatures cannot fashion blanket prohibitions on all picketing. * * * [They] are free to decide whether to permit or suppress any particular picket line for any reason other than a blanket policy against all picketing."

See, also, Howard, *The Unlawful Purpose Doctrine in Peaceful Picketing and Its Application in the California Cases*, 24 So. Calif. L. Rev. 145; Note, 41 Minn. L. Rev. 655; Tanenhaus, *Picketing — Free Speech: The Growth of the New Law of Picketing From 1940 to 1952*, 38 Cornell L. Rev. 1.

to $5,000, as ordered by the trial court if the order granting judgment notwithstanding the verdict be reversed on appeal.

The verdict as so reduced is reinstated.

Reversed in part and affirmed in part.

PETERSON, JUSTICE (dissenting).

The jury, by special verdict, found that defendants violated Minn. St. 179.11(7)[1] and 179.42[2] by picketing and other acts directed against plaintiffs, who are self-employed persons without employees, for the purpose of coercing them, or one of them, to join the defendant union. The court seems to hold that the acts of defendants were unlawful because contrary both to basic statutory policy and judicially declared public policy.

The conduct of defendants does not, in my opinion, violate either of the cited statutes. The *purpose* of defendants was, I agree, clearly contrary to the literal language of § 179.11(7), for the proscription against compelling "any person" to join a labor organization against his will is obviously broad enough to include self-employed persons. The *manner* for the accomplishment of such unlawful purpose, however, was not by

---

[1] Minn. St. 179.11(7), which is part of the Minnesota Labor Relations Act, provides: "It shall be an unfair labor practice:

\* \* \* \* \*

"(7) For any employee, labor organization, or officer, agent, or member thereof, to compel or attempt to compel any person to join or to refrain from joining any labor organization or any strike against his will by any threatened or actual unlawful interference with his person, immediate family, or physical property, or to assault or unlawfully threaten any such person while in pursuit of lawful employment."

[2] Section 179.42, which is § 3 of L. 1947, c. 486, relating to secondary boycotts *and* other coercive practices, provides: "It is an unlawful act and an unfair labor practice for any person or organization to combine with another, to cause loss or injury to an employer \* \* \* or to induce, or to attempt to induce, another to withhold patronage or other business intercourse, for the purpose of inducing or coercing such employer to persuade or otherwise encourage \* \* \* his employees to join \* \* \* any labor union \* \* \* or for the purpose of coercing such employer's employees to join \* \* \* any labor union or organization."

unlawful interference with person, immediate family, or physical property of plaintiffs, nor by assault or unlawful threat against them—that is, conduct different from peaceful picketing. On the other hand, the manner by which defendants undertook to achieve their purpose was of the coercive character proscribed by § 179.42—yet its purpose was not proscribed by that section, for the section plainly relates only to the unlawful coercion or inducement of *employees*. I would hold as a matter of law, therefore, that the statutes are on their face inapplicable to the facts of this case.

I concede that it is within the judicial power of this court to declare such activities unlawful as contrary to public policy. The trial court instructed the jury:

"* * * An objective may be declared contrary to public policy or unlawful by either the legislature or by the Supreme Court of the state. Although the public policy of the state may be found in its constitution, statutes, and court decisions, really its establishment is primarily for the lawmakers, the legislature."

The court's instructions additionally contained a reading of the provisions of §§ 179.11(7) and 179.42. I think it highly doubtful, in this context, that the jury based its verdict on considerations of public policy other than the statutes. Because Minnesota has rather comprehensive labor relations statutes, I think the court itself should defer to legislative action [3] and not add to the body of labor law by judicial decision.

---

[3] It is, of course, competent for the legislature to proscribe conduct of the kind involved in this case. Section 8(b) (4) of the National Labor Management Relations Act prohibits labor organizations from engaging in such concerted activity where an objective of such activity is "forcing or requiring any employers or self-employed person to join any labor or employer organization." 61 Stat. 141, as amended, 29 USCA, § 158(b) (4). In my view, the omission of such express provision in the state labor relations act itself represents a contrary determination of state public policy.