IN RE CERTIFICATION OF A BARGAINING AGENT.
AMALGAMATED FOOD HANDLERS, LOCAL 653-A.
EGEKVIST BAKERIES, INC.
RETAIL CLERKS UNION, LOCAL 1086.[1]

April 7, 1955.

No. 36,861.

[1]Reported in 70 N. W. (2d) 267.

*Peterson & Karigan, Robert Karmel,* and *S. G. Lippman,* for appellant.

*Thomas O. Kachelmacher,* for respondent Amalgamated Food Handlers.

*Robert Van Fossen,* for respondent Egekvist Bakeries, Inc.

THOMAS GALLAGHER, JUSTICE.

Appeal from an order of the district court of Ramsey county, affirming an order of Harry Hanson, Labor Conciliator of the state of Minnesota, which certified respondent Amalgamated Food Handlers Local 653-A, hereafter referred to as the food handlers union, as the exclusive representative for collective bargaining purposes of some 51 employees of Egekvist Bakeries, Inc. Retail Clerks Union, Local 1086, hereafter referred to as the clerks union, which had previously been such representative, petitioned the district court of Ramsey county for a writ of certiorari to review the order of the conciliator on the ground that he had acted contrary to law (1) in divesting it of its representative capacity while its contract with

Egekvist Bakeries, Inc., was still in effect; (2) in certifying the food handlers union after it had been defeated in an election on the issue of representation; and (3) in overruling the results of such election on the basis of information received in a secret investigation conducted under his direction. The writ of certiorari was issued.

The facts are as follows: On May 20, 1953, pursuant to M. S. A. 179.16, subd. 2, conciliator was served with a request by the food handlers union that it be certified as representative of the described employees for collective bargaining purposes. At that time, there was in effect a collective bargaining agreement which extended to July 31, 1954, wherein the clerks union was recognized as such representative. On May 25, 1953, the clerks union notified the employer of its desire to negotiate wage adjustments as authorized in its contract. On June 1, 1953, the conciliator conducted a hearing on the petition of the food handlers union at which representatives of both unions were present. At that time, the food handlers union presented applications or authorization cards, signed by 49 of the 51 employees involved, on each of which the food handlers union was designated as the signers' choice for bargaining representative. At the close of the hearing the conciliator announced that an election on the question of representation would be conducted in the near future, and Mr. E. B. Richardson, representative of the clerks union, requested at that time that the clerks union be included on the official ballot therefor.

On June 20, 1953, the employer mailed to the conciliator a list of the addresses of all employees to whom ballots were to be mailed, and it is not disputed that it then knew the election was to be conducted by mail shortly thereafter. On June 23 or 24 Mr. Richardson arranged for a meeting with Mr. Christian Egekvist, general manager of the employer corporation, for the afternoon of June 30, 1953, to negotiate wage increases under the existing contract, advising Mr. Egekvist that, if the employer refused, the clerks union would take the matter to court or possibly call a strike.

On June 25, 1953, notices of a meeting of the clerks union to be held the evening of June 30, 1953, were mailed to the employees by Mr. Richardson. On the morning of the 25th, he received a registered

letter from the conciliator with notice of the forthcoming election therein. In the notice of meeting mailed to the employees he referred to a matter of "utmost importance" to be discussed thereat. At the hearing, when asked what this matter related to, he replied, "when the rank and file of your membership * * * is faced with the possibility of having an election, you are going to make an attempt to maintain your own people."

On June 29, 1953, the election ballots were mailed to and received by the employees. On June 30, 1953, at the afternoon meeting with Mr. Egekvist, Mr. Richardson again advised the former that, if negotiations for wage increases with the clerks union were not instituted, the employer would be faced with a strike. The negotiations which followed resulted in the employer offering the employees a wage increase of ten cents per hour, effective July 1, 1953, and twelve cents an hour, effective September 1, 1953.

The meeting of the employees set for the evening of June 30, 1953, was postponed to July 1, 1953. At that meeting, Mr. Richardson advised them of the wage increase offer and "made it clear to the people that the 12 cents could only be given * * * in the event the Retail Clerks [clerks union] represented them"; that "to negotiate the 12 cents," the clerks union "must retain the bargaining rights by winning the election," although Mr. Egekvist testified that he intended that the offer would carry over regardless of which union prevailed.

Thereafter, the employees cast their ballots, 40 to retain the clerks union as against 11 in favor of the food handlers, and on July 14, 1953, the conciliator certified the clerks union as the employees' representative for bargaining purposes. The food handlers union thereupon filed objections to the conciliator's certification on the ground that there had been interference in the election by the employer and the clerks union. A hearing thereon was set for July 30, 1953.

At this hearing evidence was presented establishing the facts as outlined. The employer took the position that it would bargain with whichever union was certified by the conciliator and had no prefer-

ence in the matter. After the hearing, further investigations were conducted by an assistant conciliator, particularly as to whether the signatures on the 49 application cards previously submitted by the food handlers union were authentic and procured without duress and as to whether any of the parties had influenced the election unfairly. Based partially upon the hearing and partially upon the investigation, the conciliator concluded that the authorization cards were genuine and procured without duress and that considerable unfair pressure had been brought to bear on the employees during the conduct of the election. In consequence, on October 1, 1953, he withdrew the certification of the clerks union as bargaining representative and certified the food handlers therefor.

Subsequently, after hearing on the writ of certiorari issued upon the petition of the clerks union, the district court, upon review of the files and proceedings before the conciliator, ordered that the conciliator's action in certifying the food handlers union as bargaining representative of the employees be in all respects affirmed. The appeal is from this order and the same issues are presented.

■ We are of the opinion that under applicable statutes the conciliator is authorized to certify a new bargaining representative for an employees' group, even though the latter is covered by a valid collective bargaining agreement. Section 179.135, subd. 1, provides:

"No employer holding a valid collective bargaining agreement with any labor organization * * * certified by the State Labor Conciliator * * * as the accredited bargaining representative * * * shall be required to enter into negotiations with any other labor organization * * * *except where a successor labor organization has been certified as the representative of the employees covered by such agreement* * * *." (Italics supplied.)

Section 179.16, subd. 2, further provides that:

"* * * If the labor conciliator has certified the representatives as herein provided, he shall not be required to again consider the matter for a period of one year *unless it appears to him that sufficient reason* exists." (Italics supplied.)

These provisions manifest the legislative intent that a contract of the kind described would not bar the conciliator from certifying, after investigation, a successor labor organization as bargaining representative of the employees covered if there exists sufficient reason therefor, and it would seem that, where, as in the instant case, there is substantial dissatisfaction by a majority of the employees with the representative designated in the contract, that this would constitute sufficient reason for such actions.

■ The clerks union urges that the "contract bar" principles formulated by the National Labor Relations Board should be applied. We cannot agree with this in view of the specific language of §§ 179.135, subd. 1, and 179.16, subd. 2, which distinguishes our act from the national act. As a matter of policy, the national board has stated that, whenever an existing collective bargaining agreement is urged as a bar to an election on the issue of representation, the board must balance two separate interests: (1) That of stabilizing labor relations for the duration of a contract secured through bona fide bargaining; and (2) that of protecting employees' right to act freely in the designation of their bargaining representative. General Motors Corp. Detroit Trans. Div. 102 N. L. R. B. 1140.

In reconciling these interests, the board has moved steadily in the direction of holding contracts of increasingly greater duration to constitute bars to representation elections. In its earlier decisions, it determined that contracts in excess of one year were of unreasonable duration and should not bar such an election after the expiration of such year. Columbia Broadcasting System, Inc. 8 N. L. R. B. 508; Wichita Union Stockyards Co. 40 N. L. R. B. 369. In the interests of stability, it later extended to two years the contract term which it deemed would be regarded as of reasonable duration. Reed Roller Bit Co. 72 N. L. R. B. 927. Its policy now seems to be that a contract extending beyond two years may still be of such reasonable duration as to bar an election if a substantial part of the industry involved is covered by contracts of like terms. General Motors Corp. Detroit Trans. Div. 102 N. L. R. B. 1140; Republic Aviation Corp. 34 L. R. R. M. 1406. This evolution of policy to present standards

makes it clear that the principle of "contract bar" may or may not be applicable as the board deems existing conditions warrant. As stated in N. L. R. B. v. Grace Co. (8 Cir.) 184 F. (2d) 126, 129:

"* * * The Board's rule that * * * a valid written * * * agreement between an employer and an appropriate bargaining representative is a bar to a certification proceeding for a different representation * * * is a procedural rule which the Board in its discretion may apply or waive as the facts * * * may demand in the interest of stability and fairness in collective bargaining agreements."

Here § 179.16, subd. 2, compels a policy different from that applied by the national board. The language of our statute makes it clear that the option of calling an election, notwithstanding the presence of a contract, rests with the state conciliator. Should a different rule be deemed beneficial to labor relations here, authority therefor must emanate from the legislature.

■ It is equally clear from our decisions that here the conciliator, in certifying the bargaining representative, was not bound by the election, particularly where it could be determined that unfair practices may have influenced the result thereof. The procedure for certification is governed by § 179.16, subd. 2, which provides:

"* * * In any such investigation [as to certification for representation], the labor conciliator may provide for an appropriate hearing, and may take a secret ballot of employees or utilize any other suitable method to ascertain such representatives, * * *."

The optional features of the Minnesota act as to elections or alternative methods of investigation distinguish it from the National Labor Relations Act, as amended, where a secret ballot as the basis for determination of representation is mandatory. 61 Stat. 144, 29 USCA, § 159(c)(1). As we stated in Warehouse Employees Union v. Forman Ford & Co. 220 Minn. 34, 38, 43, 18 N. W. (2d) 767, 769, 771:

"It is evident from the statutes that the conciliator has been given wide discretion in the matter of the selection of a representative.

\* \* \* The reason for calling an election was to insure a free choice \* \* \* without intimidation by either side. \* \* \* the conciliator was not obliged to hold a hearing or order an election. He could have certified without either. \* \* \* [or might] 'utilize any other suitable method to ascertain such representatives.' \* \* \*

\* \* \* \* \*

"\* \* \* the election \* \* \* was tainted by the unlawful acts of the employer, \* \* \*. It did not represent a free expression of the wishes of the employes. \* \* \* Conciliator adopted another 'suitable method' to ascertain such representative. Representation cards had been signed by the majority of the employes eligible to vote. \* \* \* The use of such cards \* \* \* would certainly be the adoption of a 'suitable method' \* \* \*. In our opinion, the conciliator had authority and jurisdiction to receive and act upon the petition of May 19, 1944, filed with him by the union."

See, also, State ex rel. American Federation, etc. v. Hanson, 229 Minn. 341, 38 N. W. (2d) 845.

It is clear from the foregoing that here the conciliator could have based his decision either upon a hearing, a secret ballot, or the utilization of any other suitable method such as reference to the authorization cards to ascertain the employees' choice. When it appeared that during the election the employer had offered a wage increase which the representative of the clerks union then stated was contingent upon retention of the latter union, the conciliator was justified in ordering a hearing to determine if there had been any unfair interference with the election to the extent of preventing a free choice on the part of the employees. See Seneca Knitting Mills, Inc. 15 L. R. R. M. 165, and Continental Oil Co. 15 L. R. R. M. 30, where the National Labor Relations Board ruled that announcements of wage increases on day preceding representation elections required nullification of the results thereof.

■ It is finally contended that a secret investigation, conducted by an assistant conciliator after the hearing and relied upon by the conciliator, was contrary to due process and that the determination of the conciliator was invalid in that the investigator's findings

formed in part the basis of it. The investigation was for the purpose of ascertaining (1) whether the signatures on the application blanks of the food handlers union were valid; (2) whether they were obtained under duress or by misrepresentation; and (3) whether there was a concerted effort by any party to influence the vote of the employees after the election had been ordered.

Section 179.16 authorizes the conciliator to conduct hearings in controversies involving selection of bargaining representatives. Section 179.05 provides that he shall adopt reasonable and proper rules for the conduct of such hearings. Rules and Regulations for Proceedings Under Minnesota Labor Relations Act, Rules for Certification of Bargaining Agents, § 9, adopted by the conciliator, provides that, if the conciliator shall determine, after the close of such a hearing, "upon the record made therein" that objections to a certification are well taken, he shall forthwith declare it void and proceed as though no certification had been made. It is clear therefrom that, when a hearing has been called for the purpose of considering objections to certification of a bargaining representative, the validity thereof must be determined "upon the record made therein." In the instant case, although the conciliator held the hearing prescribed, his determination was not based solely upon the record thereof but was founded also upon the private investigation conducted later by his assistant. In this, we think, the conciliator erred. As stated in Juster Bros. Inc. v. Christgau, 214 Minn. 108, 119, 7 N. W. (2d) 501, 507:

"* * * The requirement of due process means opportunity for a hearing, *i.e.,* opportunity to be present during the taking of testimony or evidence, to know the nature and contents of all evidence adduced in the matter, and to present any relevant contentions and evidence the party may have."

See, also, Morgan v. United States, 304 U. S. 1, 58 S. Ct. 773, 82 L. ed. 1129; English v. City of Long Beach, 35 Cal. (2d) 155, 217 P. (2d) 22, 18 A. L. R. (2d) 547; Mazza v. Cavicchia, 15 N. J. 498, 105 A. (2d) 545; Annotation, 18 A. L. R. (2d) 552. Even though the evidence submitted at the hearing may well have been sufficient to

support the determination without resort to the investigator's report, this fact would not be sufficient to uphold it where it is clear it was not based entirely thereon as required by § 179.16, subd. 2, and § 9 of the rules promulgated thereunder referred to above. English v. City of Long Beach, *supra;* Gauthier's Case, 120 Me. 73, 113 A. 28; Dembeck v. Bethlehem Shipbuilding Corp. 166 Md. 21, 170 A. 158; cf. Ohio Bell Tel. Co. v. Public Utilities Comm. 301 U. S. 292, 57 S. Ct. 724, 81 L. ed. 1093.

Accordingly, the case must be remanded for such further proceedings as will result in a decision based solely upon the record at the hearing or such further hearing as may be essential to comply with statutory requirements and the rules above set forth.

Reversed and remanded with directions to proceed in accordance with this decision.