JOHNSON BROTHERS WHOLESALE LIQUOR COMPANY
AND ANOTHER v. UNITED FARM WORKERS NATIONAL
UNION, AFL-CIO, AND OTHERS.

241 N. W. 2d 292.

April 2, 1976—No. 45815.

*Kenneth J. Enkel* and *Robert D. Metcalf*, for appellants.

*Shanedling, Phillips, Gross & Aaron, Felix M. Phillips*, and *Stanley V. Shanedling*, for respondents.

*Randall D. B. Tigue, John Cook, Mark Cosimini, Jeanine Joncas*, and *George Roes*, for Minnesota Civil Liberties Union, amicus curiae, seeking reversal.

Heard before Rogosheske, Todd, and Yetka, JJ., and considered and decided by the court en banc.

ROGOSHESKE, JUSTICE.

This is an appeal from an amended order filed on February 6, 1975, permanently enjoining defendant union and its employees and agents from picketing retail liquor stores in Hennepin County except in conformance with certain restrictions set forth in the amended order and denying defendants' motion for a new trial. Defendants contend that this injunction was improper because the trial court lacked jurisdiction to issue the injunction and because the injunction, as subsequently amended and enlarged, constitutes an unconstitutional prior restraint on free speech in violation of the First Amendment of the United States Constitution. We conclude that the trial court possessed the requisite authority necessary to issue the injunction but find

that the injunction, as amended, is in part inconsistent with the principle against the prior restraint of activities protected by the First Amendment. We therefore affirm but remand for modification of the terms of the amended injunction in accordance with this opinion.

Plaintiffs are wholesale distributors of wine, including Gallo wines, to Minnesota retail package liquor stores. They commenced this action to enjoin alleged illegal secondary boycott activities by defendants, the United Farm Workers National Union, AFL-CIO (UFW), its named agents, and other persons acting in concert with them. On the afternoon and evening of December 31, 1974, defendants and numerous unnamed persons began a campaign of picketing at various package liquor stores in Hennepin County to whom plaintiffs sell wine for resale. The picketing consisted of assembling a number of UFW supporters at retail outlets which sold Gallo products. A labor dispute exists in California between UFW, the Teamsters Union, and E & J Gallo Winery concerning representation of the agricultural workers employed by the winery. Some of the picketers carried banners and signs calling attention to the labor dispute and urging a boycott of Gallo products. Some of the signs stated "Gallo Winery ON STRIKE Boycott Gallo Wines." The words "ON STRIKE" were in larger print than the other words. At all of the stores a handbill was distributed to customers explaining the labor dispute and urging customers not to buy Gallo products. None of the signs or handbills urged customers not to patronize the retail liquor stores or plaintiff distributors.

At least four retail liquor stores were picketed by defendants, and the estimates of the number of pickets at each store ranged from 25 to 50. There was no evidence offered at trial of any violence or threatened violence by defendants. Due to the disturbance created by the pickets, police came spontaneously to one of the liquor stores to make the sidewalks and parking lot usable for patrons of the store. The trial court found that on several occasions the pickets blocked ingress to and egress from the

parking lot and the retail stores. One store manager testified, and the trial court found, that some pickets told customers not to patronize the retail store at all (without making reference to Gallo products only).

After the picketing had begun at the various stores, defendant Ross Williams or another UFW representative entered each store and discussed the Gallo boycott with the manager and on at least two occasions handed the manager a prepared letter explaining the UFW labor dispute and the Gallo boycott. This letter was addressed to "Twin City Liquor Stores." The UFW representative then orally informed the store manager that the pickets would remain until the manager removed all Gallo wines from his shelves or covered them up.

As a result of the above activities, each of the retail store managers eventually acquiesced in the demands of defendants by removing Gallo products from sale at his store. At this point, the pickets and other persons ceased the above activities and left the premises altogether. The effect of the above activities was to reduce substantially the sale of Gallo products in Hennepin County during the period from December 31, 1974, to late January 1975.

On January 3, 1975, defendant Williams and others went to the office of Johnson Brothers in St. Paul to inform plaintiffs of the above activities and to state that defendants intended to continue these activities unless plaintiffs ceased dealing with Gallo and handling Gallo products. Plaintiffs are the principal wholesale distributors of Gallo products in Minnesota and did not agree to the demand of defendants.

Subsequently, plaintiffs brought this action claiming that defendants' activities violated the so-called Secondary Boycott Act, Minn. St. 179.40 to 179.47. Pursuant to a stipulation of the parties, the trial court scheduled a consolidated hearing for January 13 on plaintiffs' motion for a temporary restraining order and for a temporary and permanent injunction. After the hearing, the trial court issued its first order, dated January 17, enjoining defendants from picketing where the "immediate or con-

trolling" objective of such picketing was to injure plaintiffs so as to induce plaintiffs to refrain from handling Gallo products. The court also enjoined defendants from obstructing ingress to or egress from any retail liquor store in Hennepin County by such picketing. In the memorandum attached to the order, the trial judge stated that the order specifically prohibited (1) the blocking of access to parking areas, (2) interfering with free ingress or egress, and (3) activities urging consumers not to patronize stores selling Gallo products. The trial judge also found the banners used by defendants to be deceptive.

On January 28, the court held a hearing on plaintiffs' motion to hold defendants in contempt for violating the January 17 injunction and for further injunctive relief based upon supporting affidavits and on defendants' motion for a new trial.

On February 6, the court denied the motion for a new trial and made further findings of fact, conclusions of law, and a new order for judgment. The court found that after January 17 defendants had continued to picket various retail stores with up to eight pickets, had used deceptive banners, had distributed letters to store managers, and had successfully coerced stores to remove Gallo wines from their shelves. In the amended order for judgment, the court repeated the general prohibitions of the January injunction and added that defendants could use no more than three pickets at each consumer entrance, could communicate with retail liquor store managers only as consumer pickets, must notify the store manager of the consumer boycott before beginning picketing, and must use only banners or signs clearly captioned in large letters "To the Consumer." The trial judge did not hold defendants in contempt because he concluded defendants had violated the January 17 injunction "unintentionally." On February 14, 1975, plaintiffs moved the trial court to make the injunction effective throughout Minnesota, which motion the court granted by order of March 7, 1975.

■ The threshold claim of defendants is that the trial court was without jurisdiction to enjoin their picketing of local liquor

stores as a secondary boycott.[1] The relevant portion of the Secondary Boycott Act, § 179.41, defines a secondary boycott to include—

"* * * any combination, agreement, or concerted action;

\* \* \* \* \*

"(c) to cease performing or to cause any employer to cease performing any services for another employer, or to cause any loss or injury to such other employer, or to his employees, for the purpose of inducing or compelling such other employer to refrain from doing business with, or handling the products of, any other employer because of an agreement, dispute, or failure of agreement between the latter and his employees or a labor organization."

The same act declares secondary boycotts to be an "illegal combination in restraint of trade and in violation of the public policy of this state," § 179.43, and to be "an unfair labor practice and an unlawful act," § 179.44. The act sets forth the following rights and remedies (§ 179.45):

"Any person who shall be affected by, or subjected to, or threatened with a secondary boycott, or any of the acts declared to be unlawful by sections 179.40 to 179.47, shall have all the rights and remedies provided for in Minnesota Statutes 1945, Chapter 179, but shall not be restricted to such remedies."

The trial judge in issuing the injunction in the case at bar rested his authority upon § 179.45 and the inherent equitable powers of a state court of general jurisdiction.

■ Defendants argue that, if § 179.45 is the statutory basis

---

[1] State court jurisdiction in the instant case is not preempted by Federal law because Federal courts have held that organizations of agricultural workers are excluded from coverage under the Federal secondary boycott law. See, e. g., Di Giorgio Fruit Corp. v. N.L.R.B. 89 App. D. C. 155, 191 F. 2d 642, certiorari denied, 342 U. S. 869, 72 S. Ct. 110, 96 L. ed. 653 (1951); 29 USCA, §§ 152(3) and 158(b)(4). Cf. Annotation, 32 A. L. R. 2d 1026.

for the court's injunction, [2] then the equitable jurisdiction of the trial court is limited and regulated by the so-called Anti-Injunction Act, §§ 185.07 to 185.19.[3] The trial court in its January 17 memorandum accompanying its decision held that the Anti-Injunction Act did not limit the court's jurisdiction and repeated that conclusion in its February 6 memorandum, stating:

"* * * The statutory history shown by defendants shows only

[2] As an alternative to the argument discussed above, defendants maintain that Minn. St. 179.45 should be construed to refer to and rely upon § 179.14, which authorizes injunctive relief against various unfair labor practices. Defendants contend that if § 179.45 is so construed, then the Secondary Boycott Act, like the Minnesota Labor Relations Act, does not apply to agricultural workers. § 179.01, subds. 4 and 6. We disagree with this conclusion for three reasons. First, we believe that § 179.45, standing alone, authorizes injunctive relief against secondary boycotts since § 179.45 simply makes available to the victim of a secondary boycott all remedies referred to in the Minnesota Labor Relations Act (e. g., injunctions) and does not state that remedies against secondary boycotts are restricted by limitations applicable to the Labor Relations Act. Second, there is no indication in the language of the Secondary Boycott Act itself or in the act's stated purposes and policy, § 179.40, which would support the inference that agricultural workers were intended by the legislature to be excluded from coverage under the Secondary Boycott Act. Third, the reasons for excluding agricultural workers from coverage under the Labor Relations Act do not apply to the Secondary Boycott Act. Agricultural workers are neither protected nor regulated by the former act because employer-employee relations in agriculture are assumed to be significantly different from employer-employee relations in other industries. The Secondary Boycott Act, however, does not regulate employer-employee relations but protects neutral employers and employees from the actions of third parties. This policy of protecting neutral employers and employees is offended as much by a secondary boycott by agricultural workers or their agents as it is by a secondary boycott by any other group. There exists therefore no sound basis for this court to compromise the protection afforded neutral employers and employees by the Secondary Boycott Act by reading an exemption for agricultural workers into that act.

[3] The Anti-Injunction Act is sometimes referred to as the "little Norris-La Guardia Act."

that the Legislature considered the interpretation now given to the statutes by this Court and decided to leave such matters of statutory interpretation to the judicial branch."

Defendants argue that the trial court erred in failing to find its jurisdiction limited by the Anti-Injunction Act in that it did not, and could not, make the necessary finding of the existence of "fraud or violence" which must precede the issuance of an injunction in a manner consistent with that act. §§ 185.10 (5) and 185.14. Whether these provisions of the Anti-Injunction Act, enacted in 1933, apply to restrict district court jurisdiction under the Secondary Boycott Act, enacted in 1947, is an issue of acknowledged difficulty.

Defendants claim that the former act applies and limits the latter act for two reasons. First, by its terms the Secondary Boycott Act is not expressly exempted from coverage under the Anti-Injunction Act. Second, defendants argue the legislative history of the Secondary Boycott Act indicates that it was not intended to be exempted from coverage under the Anti-Injunction Act.

The legislature has in the course of enacting labor legislation in the years following the 1933 Anti-Injunction Act expressly excluded certain legislation from coverage under provisions of the 1933 act. Thus, in enacting the 1939 Labor Relations Act, the legislature excluded injunctions issued against various unfair labor practices, defined in §§ 179.11 and 179.12, from the limitations imposed by the 1933 Anti-Injunction Act. § 179.14. In 1947, the year in which the Secondary Boycott Act was passed, the legislature expressly excluded strikes by hospital employees from the limitation imposed by the Anti-Injunction Act. § 179.39. Defendants conclude therefore that the omission of any reference to the 1933 act in the 1947 Secondary Boycott Act indicates a deliberate legislative determination that injunctive relief authorized by the 1947 act should be limited by the 1933 act.

This conclusion, it is urged, is further substantiated by the legislative history of the 1947 Secondary Boycott Act. When this

act emerged from the senate, it provided in part: "* * * [A]nd the provisions of Chapter 179 and 185 of Minnesota Statutes 1945 relating to injunctions shall not apply." The house deleted this portion of the senate bill before passing the bill in its present form. § 179.45. Subsequently, the senate concurred in the house amendments to the bill and the senate bill became law. Thus, defendants conclude that the legislature directly considered the issue and determined not to exempt the Secondary Boycott Act from the limiting provisions of the Anti-Injunction Act.

For the reasons set forth above, we agree with defendants that the jurisdiction of the trial court in this case was subject to regulation under the Anti-Injunction Act.[4] We do not agree, however, that under that act the trial court was deprived of jurisdiction to issue an injunction.[5] Section 185.10 of the Anti-Injunction Act provides in relevant part:

"No court of the state shall have jurisdiction to issue any restraining order, or temporary or permanent injunction, in any case involving or growing out of any labor dispute, to prohibit any person or persons participating or interested in such dispute, as these terms are defined in this chapter, from doing, whether singly or in concert, any of the following acts:

* * * * *

"(5) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking,

---

[4] Plaintiffs suggest that, even if the 1933 Anti-Injunction Act applies to the Secondary Boycott Act, the 1933 act is not applicable in the case at bar because the present case is not one "which involves or grows out of a labor dispute" within the definition of § 185.18, subd. 2. This claim is without merit since the present controversy is between persons who have "direct or indirect interests" in the same industry and involves "conflicting or competing interests in a 'labor dispute' of 'persons participating or interested' therein." § 185.18, subd. 2(3). See, also, § 185.18, subds. 3 and 4.

[5] It is clear from the record that the injunction issued herein was not contrary to public policy as declared in § 185.08 and was issued only after the procedures required by §§ 185.13 and 185.14.

patrolling, or by any other method *not involving fraud or violence.*" (Italics supplied.)

That § 185.10(5) applies to peaceful picketing was made clear by this court in Emery v. Hotel & Restaurant Employees Union, 281 Minn. 334, 342, 161 N. W. 2d 842, 847 (1968), appeal dismissed and certiorari denied, 394 U. S. 455, 89 S. Ct. 1222, 22 L. ed. 2d 413 (1969), where we stated:

"* * * Minnesota expressly recognized peaceful picketing as a constitutionally protected form of free speech by enacting a statute which prohibits its courts from restraining picketing as a means of publicizing the facts in a labor dispute as long as it involved neither fraud nor violence. Minn. St. 185.10(5)."

If, however, we were to apply the words of § 185.10(5) of the Anti-Injunction Act literally and without qualification, as defendants argue we should do, all secondary site picketing, which clearly violates the Secondary Boycott Act but which does not involve fraud or violence, would be immune from injunction. We reject this formalistic conclusion because we believe that the 1947 Secondary Boycott Act and the 1933 Anti-Injunction Act must be read in conjunction and jointly construed in a way consistent with the state policies underlying both acts.

The Minnesota Legislature in enacting the Secondary Boycott Act may be presumed to have intended to vest in the state courts power sufficient to enforce effectively the act's broad prohibition against secondary boycotts. The principal practical remedy available to a victim of a secondary boycott is an injunction against further picketing. It is not reasonable to suppose that the legislature would declare secondary boycotts to be an unfair labor practice[6] and then intentionally deprive the state courts of authority to enjoin such a practice by limiting injunctions to picketing involving "fraud or violence." We are thus persuaded that the phrase "fraud or violence" in § 185.10(5) of the 1933 Anti-Injunction Act must be read in light of the subsequent prohibi-

---

[6] § 179.44.

tion against certain kinds of coercive picketing in the 1947 Secondary Boycott Act. So read, § 185.10(5) does not prohibit injunctive relief against peaceful picketing when such picketing is in violation of an express state statute which serves a legitimate governmental interest and which expressly declares picketing of the kind engaged in in this case to be an unlawful labor practice.

■ Having found that the trial judge had the requisite authority to issue an injunction under the Secondary Boycott Act, the next issue is whether the evidence adduced at trial was sufficient to support the trial court's injunction in light of constitutional limitations upon governmental interference with peaceful picketing.

Prior to 1940, picketing as a means of exerting economic pressure was considered to be an actionable tort unless justified. Emery v. Hotel & Restaurant Employees Union, *supra*. In 1940, the United States Supreme Court in Thornhill v. Alabama, 310 U. S. 88, 60 S. Ct. 736, 84 L. ed. 1093 (1940), declared that peaceful picketing is a constitutionally protected medium of free speech which, under the First and Fourteenth Amendments, is immune from hostile state action. See, also, Carlson v. California, 310 U. S. 106, 60 S. Ct. 746, 84 L. ed. 1104 (1940). In 1943, the Minnesota Supreme Court, citing Thornhill, recognized that peaceful picketing (to induce a person to hire union labor to do work he had been doing personally) should be afforded constitutional protection. Glover v. Minneapolis Building Trades Council, 215 Minn. 533, 10 N. W. 2d 481 (1943). In N.L.R.B. v. Fruit & Vegetable Packers & Warehousemen, 377 U. S. 58, 84 S. Ct. 1063, 12 L. ed. 2d 129 (1964), the Supreme Court held that peaceful secondary picketing appealing to consumers to refrain from buying the primary employer's struck product is not prohibited by Federal law, 29 USCA, § 158(b)(4), because that law must be strictly construed when it affects the sensitive area of free speech, an approach recognizing that "a broad ban against peace-

ful picketing might collide with the guarantees of the First Amendment." 377 U. S. 63, 84 S. Ct. 1066, 12 L. ed. 2d 133.

In the years following 1940, the Supreme Court and lower state and Federal courts have qualified the above doctrine, however, by holding that primary or secondary picketing may be enjoined when:

(1) It involves violence or the threat of violence. See, Milk Wagon Drivers Union v. Meadowmoor Dairies, 312 U. S. 287, 61 S. Ct. 552, 85 L. ed. 836, 132 A. L. R. 1200 (1941); Emery v. Hotel & Restaurant Employees Union, *supra.*

(2) It blocks ingress to or egress from the picketed business. See, Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc. 391 U. S. 308, 88 S. Ct. 1601, 20 L. ed. 2d 603 (1968); Action v. Gannon, 450 F. 2d 1227, 1232 (8 Cir. 1971); Machesky v. Bizzell, 414 F. 2d 283, 290 (5 Cir. 1969).

(3) Its purpose is to coerce the employer to commit an unlawful act. See, Giboney v. Empire Storage & Ice Co. 336 U. S. 490, 69 S. Ct. 684, 93 L. ed. 834 (1949); Building Service Union v. Gazzam, 339 U. S. 532, 70 S. Ct. 784, 94 L. ed. 1045 (1950); Interlake Steamship Co. v. Marine Engineers Beneficial Assn. 260 Minn. 1, 108 N. W. 2d 627 (1961), reversed on other grounds, 370 U. S. 173, 82 S. Ct. 1237, 8 L. ed. 2d 418 (1962).

(4) The purpose of the picketing is against state or Federal legislative or judicial policy and that policy serves a legitimate governmental interest. See, International Brotherhood of Teamsters v. Hanke, 339 U. S. 470, 70 S. Ct. 773, 94 L. ed. 995 (1950); Hughes v. Superior Court, 339 U. S. 460, 70 S. Ct. 718, 94 L. ed. 985 (1950); Starr v. Cooks, Etc. Union Local No. 458, 244 Minn. 558, 565, 70 N. W. 2d 873, 878 (1955).

In the instant case, the trial court found that defendants' picketing obstructed ingress to and egress from various retail liquor stores and their parking lots. The trial court also found that the purpose of defendants' picketing violated the state's policy against coercive secondary picketing embodied in the Secondary Boycott Act. The evidence adduced at trial supports

these findings. Peaceful picketing which obstructs passageways and which violates a state secondary boycott statute is not protected by the First Amendment. The trial court properly enjoined such picketing on January 17, 1975.

█  Defendants contend that the trial court violated their constitutional rights when, on February 6, it amended and expanded the January 17 injunction so as to prohibit more than three pickets at each consumer entrance and to require certain lettering on the pickets' signs. While in the past prior restraints on the number of permitted picketers have most often been approved upon a showing of actual or threatened violence if such restrictions were not imposed, Milk Wagon Drivers Union v. Meadowmoor Dairies, *supra*, we are persuaded that under the facts of this case the limitation of three picketers per entrance was reasonable and proper in light of the court's prior finding that ingress to and egress from the liquor stores had been blocked. Rather than use his contempt power, on February 6 the trial court elected to make the injunction more specific, thereby avoiding a penalty to the union and effecting a reasonable compromise of competing interests. This limitation ensured the right of the union to fully express its views near liquor store premises, ensured the right of the stores to free access to their premises, and eliminated the prior coercive impact of a large number of picketers blocking an entrance.

It is true, as defendants argue, that there was no showing of actual or threatened violence due to their picketing. However, while peaceful picketing is a form of free speech, it is not merely speech but a hybrid of speech and action. Picketing involves the element of marching or patrolling and therefore has the potential to be obstructive and coercive as well as communicative. See, International Brotherhood of Teamsters v. Hanke, 339 U. S. 470, 474, 70 S. Ct. 773, 775, 94 L. ed. 995, 1001 (1950). When, as in the special circumstances of this case, otherwise peaceful picketing becomes obstructive and coercive, we are convinced that reasonable limitations on the number of pickets are permissible

under the First Amendment. See, Bakery Drivers Local v. Wohl, 315 U. S. 769, 775, 62 S. Ct. 816, 819, 86 L. ed. 1178, 1184 (1942); American Steel Foundries v. Tri-City Council, 257 U. S. 184, 206, 42 S. Ct. 72, 77, 66 L. ed. 189, 198 (1921).

■ In addition to the limitation of three pickets per entrance, the February 6 order also enjoined defendants:

"From delivering any letter to the owner or manager of any such retail liquor stores or having any conversations with them about their consumer picketing activities unless such letter indicates their intention to begin *consumer* picketing rather than just beginning picketing, and unless such conversation or delivery is had before the instigation of such activites.

"From carrying, displaying, or using at any such location any picket, banner, or sign that does not include a heading clearly legible in letters at least of equal size with the remainder of the message stating 'To the Consumer.' "

We are persuaded that such restrictions on the form and *content* of defendants' speech constitute an unnecessary prior restraint on the content of defendants' speech which is not justified by the facts of this case. We believe that it is not the proper role of a court of equity to tell pickets what words they must use to preface and express their ideas or to whom they must talk. Such restrictions and prior restraints upon speech are inconsistent with the First Amendment when less drastic means are available to protect the legitimate interest of plaintiffs in freedom from deceptive picketing. See, Alexander v. City of St. Paul, 303 Minn. 201, 227 N. W. 2d 370 (1975).

In Kaynard v. Independent Routemen's Assn. 479 F. 2d 1070, 1073 (2 Cir. 1973), the court stated that "[w]hen the union elects to picket at a secondary site, it assumes the obligation of clearly identifying the struck product." This same duty rests upon consumer pickets who picket at a secondary site and would in this case justify an order prohibiting defendants from engaging in deceptive picketing. An injunction phrased in these gener-

al terms would not chill defendants' right to free speech and would permit the trial judge in a subsequent contempt proceeding to distinguish carefully after the fact whether defendants' conduct and speech were constitutionally protected under the First Amendment or unprotected and in violation of the state secondary boycott law. While injunctions stated in specific terms (e. g., three pickets per entrance) are generally desirable because they alert the enjoined party to exactly what is and is not prohibited,[7] this principle does not extend to warrant an order commanding citizens to express their grievance or ideas in the specific words of the court or not at all. In this case, the proper remedy of plaintiffs, should they continue to object to the content of defendants' signs or handbills, is to seek relief in a subsequent contempt proceeding.

Accordingly, we affirm the authority of the trial court to issue the injunction but remand with directions to modify the terms of the February 6 injunction in a manner consistent with this opinion. No costs or disbursements are allowed either party.

---

[7] Channel 10 v. Independent School Dist. No. 709, 298 Minn. 306, 325, 215 N. W. 2d 814, 827 (1974).