MINNESOTA RACETRACK, INC., et al., Relators (C0–86–1789),

and

Canterbury Downs Union Coalition, Relator (C4–86–1939),

v.

Paul W. GOLDBERG, Director, Bureau of Mediation Services, Respondent,

International Brotherhood of Electrical Workers, Local 292, Respondent (C0–86–1789).

Nos. C0–86–1789, C4–86–1939.

Court of Appeals of Minnesota.

April 14, 1987.

Robert S. Burk, Douglas P. Seaton, Matthew E. Damon, Popham Haik Schnobrich Kaufman, Minneapolis, for Minnesota Racetrack, Inc., et al.

Richard A. Williams, Hvass, Weisman & King, Minneapolis, for Canterbury Downs Union Coalition.

Hubert H. Humphrey, III, Atty. Gen., Brad P. Engdahl, Sp. Asst. Atty. Gen., St. Paul, for Paul W. Goldberg, Director, Bureau of Mediation Services.

Gregg M. Corwin, St. Louis Park, for Intern. Broth. of Elec. Workers, Local 292.

Considered and decided by FORSBERG, P.J., and RANDALL and STONE, JJ.,* with oral argument waived.

## OPINION

RANDALL, Judge.

This is an appeal by writ of certiorari from a decision of the Bureau of Mediation Services (BMS) certifying a union local. Minnesota Racetrack, Inc., Minnesota Concessions, Inc.,[1] and Canterbury Downs Un-

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

1. Minnesota Racetrack, Inc. and Minnesota Concessions, Inc. are the employers.

ion Coalition[2] appeal from the determination of objections to certification of the International Brotherhood of Electrical Workers Local 292 (Local 292) as exclusive bargaining unit. That certification by the director of the BMS was made October 15, 1986. Both the employers and the unsuccessful union appealed by writ of certiorari. This court consolidated the appeals of Minnesota Racetrack and the Canterbury Downs Union Coalition. We affirm.

## FACTS

In 1984, Canterbury Downs Coalition approached the Minnesota Racetrack, Inc. and Minnesota Concessions, Inc. (employer) seeking exclusive bargaining representation of Canterbury Downs employees. At the time, the coalition included five AFL-CIO affiliated local unions, a local union affiliated with the International Brotherhood of Teamsters, respondent Local 292, the Minneapolis Building and Construction Trades Council (MBCTC), and the Minneapolis Central Labor Union Council (MCLUC). Local 292 was admittedly signatory to the initial coalition request for recognition. Local 292, MBCTC and MCLUC subsequently dropped out of the coalition.

Because the National Labor Relations Board (NLRB) declined jurisdiction pursuant to 29 C.F.R. § 103.3 (1986),[3] the director (director) of the BMS stated that BMS would assert jurisdiction over questions of representation and labor relations issues at Canterbury Downs Racetrack. On February 18, 1986, the director certified the coalition as the exclusive bargaining representative of the employees. On May 15, 1986, Local 292 filed a representation petition with the director. In its petition, Local 292 requested certification as exclusive bargaining representative for employees in Mechanics I, II and III classifications, a subgroup of the bargaining unit represented by the coalition, and it sought severance of that group of craftsmen. The BMS dismissed the petition.

Local 292 filed a second petition, seeking to represent all employees within the bargaining unit represented by the coalition. The director combined a hearing on this second petition with a petition of Twin Cities Carpenters District Council (Carpenters) requesting certification of a carpenter craft unit. Prior to the hearing, the BMS stated that dates for any elections conducted as a result of these matters would be August 29 and 30, 1986. After a hearing on August 19, 1986, the BMS denied the Carpenters' petition and determined that their employees showed sufficient support for Local 292's petition to warrant holding an election. The BMS issued election rules defining the scope of campaigning.

At the election on August 29 and 30, 1986, out of a total of 766 votes the employees cast 396 votes for Local 292, 25 votes for the coalition, and 340 votes for the nonunion option. On Sept. 3, 1986, the BMS certified Local 292 as the exclusive bargaining representative of the employees and the bargaining unit at Canterbury Downs. The employer and the unsuccessful coalition filed objections to the certification. The BMS found that the objections raised by the coalition and the employer did not present substantial or material issues with respect to the correctness of the certification of Local 292 as exclusive bargaining representative. The coalition and employer petitioned for writ of certiorari.

## ISSUES

1. Did the BMS err by failing to apply federal standards to its determination of the employer's objection on the basis of the prohibition of captive audience meetings?

2. Did the election rule prohibiting captive audience meetings by employer violate employer's first amendment rights?

3. Was the BMS's refusal to overturn election on the basis of Local 292's distribution of an altered facsimile of an official election ballot supported by substantial evidence?

**2.** Canterbury Downs Union Coalition was an unsuccessful applicant to be the bargaining representative.

**3.** Under this rule, the NLRB will not assert jurisdiction in the horseracing or dogracing industries.

4. Was the finding that the election date had not been formally established until after the hearing on August 19, 1986, supported by substantial evidence?

5. Was the finding that Local 292 did not destroy the laboratory conditions under which the election campaigns are to be run supported by substantial evidence?

## ANALYSIS

### I.

### *Failure to Apply Federal Standards*

In the BMS election campaign rules issued following the August 19, 1986, hearing, at which the employer's right to communicate its views was discussed, the BMS prohibited the employer or its agents from conducting "captive audience" meetings for the purpose of campaigning:

5. Because of the restrictions imposed upon the campaign activities of employees and competing employee organizations in this matter and because there are legitimate concerns over the Employer's desire to advocate a position in a matter where public policy requires employee self-determination, the Employer and its agents shall be prohibited from conducting "captive audience" meetings with individuals or groups of employees for purposes of campaigning. Given the unique circumstances of this situation, the Employer shall limit its communication with employees on this subject to written material and to oral statements by representatives made in the nonwork areas available to employees or nonemployee representatives for similar purpose. The Employer's statements in this regard shall be restricted to the extent that such communication is a reflection of objective fact or conveys the Employer's belief as to demonstrably probable consequences beyond the Employer's control.

Relators contend the BMS should have overturned the election result, and improperly failed to apply federal standards when it prohibited captive audience campaigning.

The NLRB will not assert jurisdiction over horseracing or dograting industries.

29 C.F.R. § 103.3 (1986). The NLRB has determined that "because of the unique nature of the racing industry, the regulation of labor matters governing employees should be left to the States * * *." *Walter A. Kelly*, 139 NLRB 744, 747 (1962). The NLRB found that a labor dispute in the racing industry is not likely to have serious repercussions on interstate commerce, a determinative factor in determining jurisdiction questions. *Id.*

The employer argues that the NLRB's declination of jurisdiction does not relieve the BMS of the need to apply federal standards in this case. As the employer points out, where Minnesota statutes are substantially the same as federal statutes, Minnesota will follow the decisions of the United States Supreme Court. *Dayton Co. v. Carpet, Linoleum, and Resilient Floor Decorators' Union*, 229 Minn. 87, 100, 39 N.W.2d 183, 191 (1949).

Citing *Johnson Brothers Wholesale Liquor Company v. United Farm Workers National Union*, 308 Minn. 87, 241 N.W.2d 292 (Minn.1976), the employer contends that where the NLRB does not assert jurisdiction, implementation of labor statutes which, like the Minnesota Labor Relations Act (MLRA), are modeled on the National Labor Relations Act (NLRA), is still governed by federal principles. Although the court in *Johnson Brothers* applied federal cases, it did not specifically hold that federal standards must apply in all cases where the NLRB declines jurisdiction.

■ The BMS contends that, although the Bureau may look to NLRB precedents for guidance, the difference between MLRA and NLRA does not warrant strict adherence to NLRB precedent. We agree. Where the NLRB expressly leaves regulation of labor matters to the states, we hold the BMS director did not have to rigidly apply federal standards. As the federal district court held in *Willmar Poultry Co., Inc. v. Jones*, 430 F.Supp. 573 (D.Minn. 1977):

Although * * * it would * * * seem that the legislature intended to achieve a result parallel to that obtained by the

NLRA, the State of Minnesota is, of course, free to develop its own interpretation of its statutory exclusion of individuals employed in agricultural labor. It need not interpret the exclusion in the same way that federal courts and the NLRB have interpreted the NLRA's exclusion of "agricultural laborers." *Id.* at 575, n. 2. Similarly, here the BMS need not follow the NLRB's interpretations of the NLRA.

Relator employer distinguishes *Willmar* on the basis that in the *Willmar* case, a particular Minnesota policy was to be applied. The employer does not argue that Minnesota law proscribes the captive audience prohibition. The employer points out, however, that Minnesota law is silent on the subject, while an established federal policy against the imposition of captive audience prohibitions exists. (*See generally Livingston Shirt Corp.*, 107 NLRB 400 (1953)). We do not find that distinction controlling. Because no Minnesota standard exists, the only question is whether the rule to prohibit captive audience speeches is arbitrary and capricious. *Manufactured Housing Institute v. Petterson*, 347 N.W.2d 238, 244 (Minn.1984).

## II.

### First Amendment Rights

The BMS specifically stated it was not deciding the constitutional issue because it had no jurisdiction to do so. Because there was no decision on the constitutional issue below, we decide that issue de novo.

Employer contends the captive audience prohibition violated its constitutional rights to advocate its position.

> [A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit."

*NLRB v. Gissel Packaging Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969). However, the issue of the relator employer's rights of expression must be considered in the context of the labor relations setting. *Id.* at 617, 89 S.Ct. at 1941. Any balancing of an employer's rights must take into account the economic dependence of the employees on their employer. *Id. See also Raley's, Inc., v. National Labor Relations Board*, 703 F.2d 410, 414 (9th Cir.1983) (employer's pre-election expression will be scrutinized because of possibility of coercion or undue influence).

The relator employer here contends that the prohibition against captive audience speeches constituted a denial of its constitutional rights to expression under *Gissel*. It claims the coercive or noncoercive nature of a statement cannot be determined until after the statement has been made, and the employer's free speech right cannot be limited until the BMS finds actual infringement of employee rights.

In *National Labor Relations Board v. United Steelworkers*, 357 U.S. 357, 78 S.Ct. 1268, 2 L.Ed.2d 1383 (1958), the Supreme Court held that where the union's opportunity for effectively reaching employees with a pro-union message, in spite of a no solicitation rule, is at least as great as the employer's ability to promote the legally authorized expression of its anti-union views, there is no basis for invalidating the no solicitation rule. *Id.* at 364, 78 S.Ct. at 1272. Relator employer cites this case to support its constitutional claim. However, the Supreme Court does not discuss the employer's constitutional right, but addresses the employer's right to engage in noncoercive anti-union solicitation as "protected by the so-called 'employer free speech' provision § 8(c) of the Act [29 U.S.C. § 158(c)]." *Id.* at 362, 78 S.Ct. at 1271.

In *Consolidated Edison Co. of New York, Inc. v. Public Service Commission of New York*, 447 U.S. 530, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980), the Supreme Court stated:

> A restriction that regulates only the time, place, or manner of speech may be imposed so long as it is reasonable. * * [W]e have emphasized that time, place, and manner regulations must be "applicable to all speech irrespective of con-

tent." *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 209, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975); * * *. When regulation of speech is based on content or subject matter, however, it must be more carefully scrutinized than time, place and manner restriction unrelated to subject matter. *Id.*

The employer cites *Livingston* to show that captive audience prohibitions have fallen into disfavor in federal law. *Livingston Shirt Corp.,* 107 NLRB 400 (1953). However, in *Livingston,* the NLRB did not conclude such prohibitions are unconstitutional. Captive audience prohibitions have, at times, been permissible under the federal act. *See id.* at 407. None of the parties have cited any cases finding such prohibitions flatly unconstitutional.

In *Peerless Plywood,* 107 NLRB 427 (1953), the NLRB prescribed, in an election rule, a prohibition against employer speeches to employees on employer's premises during working hours within twenty-four hours of a scheduled board election. In another case decided the same day, the NLRB stated the election rule in *Peerless Plywood* was:

> a narrow and reasonable limitation designed to facilitate the holding of free elections in the atmosphere of relative tranquility and conducive to the sober choice of representative.

*Livingston,* 107 NLRB at 408.

■ We hold that under the special facts of this case, the limitation on captive audience speeches did not unconstitutionally violate the relator employer's right to free speech. The BMS election rules limited captive audience speeches only one week before the election was to be held, and thus, covered only a short period of time before the election. The director based his decision in this case on the unique circumstances at hand.

### III.

#### Ballot Facsimile

The employer sought to set aside the election and certification on the basis that Local 292 distributed handbills containing an altered facsimile of an official BMS ballot.

In deciding whether to set aside a certification election, the Bureau must determine whether there has been "any unfair interference with the election to the extent of preventing a free choice on the part of the employees." *In re Amalgamated Food Handlers, Local 653–A,* 244 Minn. 279, 286, 70 N.W.2d 267, 272 (1955).

*Swift County-Benson Hospital v. Minnesota Bureau of Mediation Services,* 358 N.W.2d 458, 460 (Minn.Ct.App.1984).

■ The findings of the director will not be set aside if supported by substantial evidence. *State v. Sports & Health Club, Inc.,* 370 N.W.2d 844, 848 (Minn.1987). The director's finding is supported by substantial evidence if:

> the evidence, considered in its entirety, is (1) more than a scintilla of evidence; (2) such that a reasonable mind might accept it as adequate to support a conclusion; or (3) more than "some evidence" and more than "any evidence". *Taylor v. Beltrami Electric Cooperative, Inc.,* 319 N.W.2d 52, 56 (Minn.1982).

*Id.*

Prior to the election, Local 292 distributed handbills to employees. Each handbill contained a facsimile of an official BMS ballot, with an "X" in the box indicating a vote for Local 292. The handbills identified Local 292 as their source, but the ballot did not specifically identify Local 292 as the source of the "X." The handbill was posted before the posting of the official ballot, and remained posted for approximately seven to ten days. Employer contends that this misled employees to vote for Local 292 with the mistaken impression that Local 292 had the endorsement of the BMS.

In its analysis of the election ballot issue, the BMS chose to follow the federal standard. As *Johnson Brothers* suggests, however, the BMS may apply federal standards if it elects to do so.

■ Generally, the NLRB will not permit use of an altered ballot in election

campaigns. *Allied Electric Products,* 109 NLRB 127) (1954). However, use of an altered reproduction of an official ballot, that on its face clearly identifies the party responsible for its preparation, is insufficient reason to set aside a union election. *SDC Investment, Inc.,* 274 NLRB 526 (1985).

■ When the source of a ballot is not clearly identified, we must examine the nature and content of the material to determine whether the document tends to mislead employees to believe the BMS favors one party's cause. *Id.* The crucial question is whether the altered ballot is likely to have given voters the misleading impression the board favored a party. *Id.*

■ The BMS found the ballot facsimile did not tend to convey the impression that the BMS favored Local 292, Local 292 was clearly identified as source of the ballot, and objection to the ballot did not require election results to be set aside. These findings were supported by substantial evidence in the record showing the exhibit to which the ballot was affixed identified Local 292 as its source. Moreover, a supervisor at Canterbury Downs testified he did not believe the document to be an official document of the BMS, but assumed it came from the union because it was "clearly marked IBEW, Local 292 * * *." This evidence supports the finding that the ballot was not so misleading as to warrant setting aside the election.

## IV.

### Setting of Election Date

The coalition contends the BMS erroneously established the election date prior to the unit determination hearing, and the decision violated fundamental principles of administrative law because it was based upon no information at all. *See Reserve Mining v. Minnesota Pollution Control Agency,* 364 N.W.2d 411, 414 (Minn.Ct.App. 1985) (decisions of magnitude must be supported by written findings and reasons).

The coalition postulates the BMS may have improperly made its determination of the date of the election on the basis of ex parte communications, in "violation of the due process rights of all parties." This proposition is unsupported, however.

Relator coalition contends the BMS' failure to discuss reasons for the date of the election in the original investigative order was a failure to follow BMS' own rules.

The original "Notice Rescheduling Hearing and Investigatory Order," dated August 5, 1986, set a hearing for August 19, 1986, and stated:

> [t]he dates for any elections to be conducted as a result of these matters will be August 29 and 30, 1986, at the premises of the employer. The specific details of such election procedure will be established pursuant to an election order after the August 19, 1986 hearing, if necessary and appropriate.

The BMS found this clearly indicated the dates scheduled were tentative pending the August 19, 1986, hearing. The BMS states it selected the dates in question because the thoroughbred racing season closed September 1, 1986. At that time, the BMS anticipated departure of seasonal employees. The BMS, therefore, chose dates prior to the end of the thoroughbred season to "maximize the opportunity for a majority of the employees in this seasonal industry to express their views." The BMS contends August 29 and 30 were the latest feasible election dates to maximize election participation.

■ The coalition did not complain of the election date until after the election, although the coalition had opportunity, at the hearing preceding the election, to do so. The BMS takes the stand that the election dates were finalized after no one contested them at the August 19, 1986, hearing. The evidence supports this finding.

## V.

### Destruction of Laboratory Conditions

The coalition also contends that Local 292 was guilty of two kinds of misconduct: making a promise, to at least a portion of the employees, that they would get automatic pay increases if they voted for Local 292, and distributing a letter containing

false and scurrilous information misrepresenting the character of the coalition.

The contention that Local 292 had made promises of wage increases was based on the testimony of Daniel Kuschke. The record indicates that Kuschke, representative for Hotel and Restaurant Workers Union, Local 17, received two telephone calls after the election, in which the callers asked where their wage increase was. The callers allegedly were under the impression that by voting for Local 292, they were to get a wage increase. The callers were never identified.

The allegedly scurrilous information distributed by Local 292 was in a letter dated August 4, 1986, inviting Canterbury Downs employees to a picnic. The second page of the letter referred to the original bargaining agreement between the coalition and the employer as a "sweetheart deal." Kuschke testified that he received two copies of the letter from members of the coalition. The record does not reveal how many copies of the letter were distributed. Richard Larson, business representative for Local 292 testified the letter was not distributed at Canterbury Downs.

The BMS determined that since the alleged misrepresentations were made more than three weeks before the election, appellant had an opportunity to rebut them before the election. The BMS concluded that there was insufficient basis to set aside certification on the crime that acts of Local 292 contaminated the conditions needed for a representation election. The evidence supports this finding.

## DECISION

The BMS was not required to apply strict federal standards when determining an employer's objection to prohibition of captive audience meetings. The prohibition of captive audience meetings did not violate the employer's first amendment rights. The BMS' refusal to overturn the certification of a bargaining unit because an altered facsimile of official election ballot was distributed by the winning union was supported by substantial evidence. The finding that election dates were not formally established until after a hearing was held was supported by the evidence. The finding that the winning union did not destroy laboratory conditions under which election campaign was run was supported by the evidence.

Affirmed.